UNITED STATES of America,
Plaintiff–Appellee,

v.

John VAN SHUTTERS, II,
Defendant–Appellant.

No. 97–5702.

United States Court of Appeals,
Sixth Circuit.

Argued July 31, 1998.

Decided Dec. 10, 1998.

William Cohen, Asst. U.S. Attorney (argued), Sunny A. Koshy (briefed), Office of U.S. Attorney, Nashville, TN, for Plaintiff–Appellee.

Thomas W. Watson, Asst. F.P. Defender (argued and briefed), Federal Public Defender's Office, Nashville, TN, John Van Shutters, II, pro se, Dodge State Prison, Chester, GA, for Defendant–Appellant.

Before: JONES, RYAN, and MOORE, Circuit Judges.

## OPINION

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant John Van Shutters, II, appeals his conviction and sentence for a variety of federal offenses arising out of a criminal scheme in which Shutters would "purchase" automobiles using counterfeit cashier's checks that he, himself, had manufactured. Shutters challenges his conviction on the grounds that evidence used against him at trial was the tainted product of three unconstitutional searches by the police, and that his conduct did not satisfy a jurisdictional element of the federal counterfeit securities statute, 18 U.S.C. § 513. Additionally, Shutters attacks his sentence on the grounds that the district court erroneously both enhanced his sentence for obstruction of justice and denied his request for a downward departure based upon acceptance of responsibility. For the reasons stated herein, we affirm both Shutters's conviction and his sentence.

## I. Factual Background

On at least twelve occasions between March 1995 and February 1996, Shutters stole auto vehicles from their rightful owners in Tennessee and Georgia. Shutters's *modus operandi* was essentially the same in each theft. He would contact vehicle owners either at a dealership or by answering a classified newspaper advertisement. Using an alias and fake identification, Shutters would identify himself as a potential buyer of the vehicle. After "negotiations" with the vehicle owner, Shutters would consummate the "deal" by tendering a fraudulent cashier's check (ranging from $2,000 to $8,000) that he, himself, had manufactured. Shutters would then abscond with the vehicle, take it across state lines, and usually sell it to another buyer before the original owner determined that the check was counterfeit.

The nature of the counterfeit checks themselves, while not factually in dispute, is an issue in this appeal. Shutters based his forged creations on genuine cashier's checks issued by the First Tennessee Bank ("FTB"), a legitimate financial organization. Both the genuine and counterfeit checks bear the FTB logo, although on Shutters's checks, the logo is slightly larger and is placed on the upper left-hand corner as opposed to the center (where the genuine checks bear the logo). Both versions prominently display the name "First Tennessee Bank" next to the logo. Both versions proclaim that the bank is a member of the FDIC.

There are at least two readily apparent differences between FTB's checks and Shutters's forged creations. First, the genuine checks bear a notice that an indemnity bond will be required before replacing the cashier's check while, the counterfeit checks do not. Second, Shutters's checks bear a notation in smaller subscript identifying the issuer of the check as the "First Tennessee Bank Nashville." No such entity exists. There are several other minute differences between the genuine checks and the forged creations that are not readily noticeable or could only be detected through an audit by FTB's officers.[1] Despite any differences between the checks, all of Shutters's victims accepted the counterfeit checks as real, and some FTB tellers even honored the forged

---

1. For example, the check numbers on all twelve of the counterfeit checks are the same. Additionally, the computerized routing code on the counterfeit check is not a legitimate one used by FTB. Moreover, both the account number indicating the account at FTB from which funds are deposited to pay cashier's checks, as well as the code at the bottom of the check, which should correspond to the amount paid printed on the real check, are different on the counterfeit checks. It cannot seriously be argued that any of these "differences" could have been detected by the vehicle owners.

checks when initially presented by the victims.

In mid–1995, the Tennessee Highway Patrol ("THP") commenced an investigation following several reports of stolen vehicles that had been "bought" by a man using counterfeit cashier's checks issued by the FTB. By early 1996, Shutters emerged as a suspect in the case.

On May 24, 1996, an Acworth, Georgia police officer noticed several stolen vehicles on the premises of 5721 Meadow Wood Drive ("Georgia Residence"), which belonged to Shutters's cousin, Linda Ballard. Shutters was staying in the Georgia Residence at the time. After brief questioning by the police, he initially denied his true identity and gave misleading information to the officers. However, one of his victims was on the scene and identified Shutters as the one who "bought" a vehicle with a counterfeit check. Stating that he wanted to "come clean," Shutters then disclosed his true identity and was immediately arrested, handcuffed, placed in the back of the patrol car, and given warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The police subsequently entered and searched the Georgia Residence, on the strength of a claimed consent to the search. As will be discussed *infra*, the appellant denies that he consented to the search of the Georgia Residence. What is certain is that the police recovered a quantity of incriminating evidence at the Georgia Residence, including papers and records relating to Shutters's "purchase" of a stolen vehicle, as well as fraudulent identification cards. Additionally, Linda Ballard directed the officers to a laminating machine and a Polaroid camera, both of which she attributed to Shutters. Moreover, Shutters made several statements that incriminated himself to the police during the course of the search.

Later that day at the police station, Shutters contacted Ballard by telephone and directed her to destroy other incriminating evidence relating to the instant case at the Georgia Residence, including paper stock which Shutters used to print his counterfeit checks, as well as computer programs that contained images of the counterfeit checks.

Ballard refused to do so, and instead notified the police of the presence of the additional evidence at the Georgia Residence. The police then obtained a search warrant and seized the additional evidence.

Meanwhile, the THP had been active in the investigation against Shutters. Upon learning of his arrest in Georgia, the THP sought and obtained a warrant to search the premises located at 601 Sue Drive in Nashville ("Tennessee Residence"), which the THP believed to be occupied by Shutters. The THP seized numerous items similar to those recovered at the Georgia Residence, including a laminating machine, fraudulent identification cards, check printers, and other counterfeiting equipment.

After facing state charges in Georgia, Shutters was indicted in the United States District Court for the Middle District of Tennessee in the instant case on September 11, 1996. He was charged with seventeen federal offenses, including twelve counts of violating 18 U.S.C. § 513(a) (knowingly making and possessing counterfeit securities with the intent to deceive), one count of violating 18 U.S.C. § 1028(a)(1) (knowingly producing a false identification affecting interstate commerce), three counts of violating 18 U.S.C. § 2312 (transporting stolen vehicles in interstate commerce), and one count of violating 18 U.S.C. § 1028(a)(5) (possessing document-making implements with intent to produce false identification). Additionally, counts of aiding and abetting in violation of 18 U.S.C. § 2 were added to several of the charges.

Shutters filed a motion to suppress, contending that the two searches of the Georgia Residence, and the search of the Tennessee Residence violated his Fourth Amendment rights. After holding a hearing on the matter, the district court upheld all three searches. These rulings are being challenged in this appeal.

A jury trial was held on February 11–13, 1997. Convicted on all counts, Shutters was sentenced to 57 months in prison and three years of supervised release. Additionally, the district court ordered that he pay restitution in the amount of $30,457.69. This timely appeal followed.

## II. The Searches of the Georgia Residence

We first review Shutters' challenges to the two searches of the Georgia Residence. Shutters disputes the police's account that he consented to the initial search of the Georgia Residence, arguing that the warrant obtained to return to the Georgia Residence was derived from tainted information resulting from the first unconstitutional search. Any evidence recovered from the second search, he insisted, should be suppressed as well. *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

It is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Bueno,* 21 F.3d 120, 126 (6th Cir.1994); *United States v. French,* 974 F.2d 687, 693 (6th Cir.1992). The government has the burden of demonstrating that consent was "freely and voluntarily given," and was not the result of coercion, duress, or submission to a claim of authority. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Bueno,* 21 F.3d at 126; *United States v. Cooke,* 915 F.2d 250, 252 (6th Cir. 1990). The proper analysis for determining the voluntariness of a detainee's consent is to consider the "totality of the circumstances" of the alleged consent. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041; *Bueno,* 21 F.3d at 126. It is not necessary that the police inform the detainee that he or she has a right to refuse consent, but instead, such lack of warning of the detainee's right to refuse will be considered under the totality of circumstances analysis. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041; *United States v. Jones,* 846 F.2d 358, 360 (6th Cir.1988). This court will accept a finding of voluntary consent unless it is clearly erroneous. *Bueno,* 21 F.3d at 126; *French,* 974 F.2d at 693.

The district court held a hearing on Shutters' motion to suppress the evidence because of the allegedly unconstitutional search. According to the testimony of the arresting officer—Detective Michael Wiley of the Cherokee County, Georgia, Sheriff's Department—after Shutters received his *Miranda* rights, he stated that he wanted to "come clean," and that he was familiar with the *Miranda* warnings as he "heard them many times before."[2] J.A. at 146 (Wiley Testimony). Shutters then admitted that he had stolen several cars and "given the owner a counterfeit cashier's check" for the "purchase" of the cars. *Id.* at 146–47. Shutters next told Detective Wiley that there was a "little black case" containing relevant information to the vehicle "sales" inside the Georgia Residence and offered to retrieve it for Wiley. *Id.* at 148. Wiley and a second officer then escorted Shutters into the unlocked Georgia Residence, *id.* at 149, and when Shutters pointed to a black case in the living room, the officers retrieved it. It contained papers relating to a stolen vehicle, as well as fraudulent government identification badges bearing Shutters' visage. *Id.* at 150. The three men then exited the Georgia Residence without conducting additional searches. *Id.* at 150–51. The officers met Ms. Ballard outside, and she directed them back inside the Georgia Residence for the additional evidence against Shutters. *Id.* at 151–52. Specifically, Ballard herself retrieved the laminating machine and the Polaroid camera from a closet. *Id.* at 152. The officers did not conduct any further searches of the Georgia Residence until they returned a few days later with the search warrant.

Shutters essentially contends that Wiley's account of the events was untruthful, and points out several inconsistencies in Wiley's testimony. Specifically, Shutters contends that Wiley contradicted himself as to whether Shutters was handcuffed in front of or behind his body, whether Shutters or Wiley actually retrieved the black case in the Georgia Residence, and whether Shutters was placed in the patrol car before going back into the Georgia Residence. Based on these discrepancies, Shutters contends that the government did not meet its burden of estab-

---

**2.** Shutters has a fairly lengthy criminal history and was on federal supervised release for another offense at the time of his arrest in this case.

lishing, through "clear and positive testimony," that he consented to the search. *United States v. Williams,* 754 F.2d 672, 674 (6th Cir.1985).

Although noting the inconsistencies in Wiley's testimony, the district court nevertheless concluded that Wiley's testimony was credible and that Shutters had voluntarily consented to the search. The district court was further persuaded that Shutters had consented to the search to the Georgia Residence by reports of other officers that Shutters was "cordial, cooperative, and helpful" during interviews at the Georgia detention facility. J.A. at 94 n. 5 (District Court Op.).

We have at times reversed findings of voluntary consent. Such an example is *Jones,* in which the police never advised the detainee-an illiterate without formal education—of his *Miranda* rights or of his right to refuse a search. *Jones,* 846 F.2d at 360. However, we have also held that in the context of challenging consent at a suppression hearing, "the party attacking the judicial officer's credibility determination must do more than just allege that the parties told conflicting stories. An effort must be made to demonstrate why the trial court's conclusion is clearly erroneous." *Cooke,* 915 F.2d at 252. We do not believe that in this case Shutters has made the requisite showing to usurp the district court's findings.

Unlike the detainee in *Jones,* Shutters appears to be a sophisticated and experienced criminal with at least some education at the college level. Moreover, we agree with the district court that the inconsistencies in Wiley's testimony, which Shutters highlights, were relatively minor and did not render Wiley's testimony incredible. We thus hold that the district court's conclusion—that Shutters voluntarily consented to the search of the Georgia Residence—was not clearly erroneous. Additionally, we find Shutters's *Wong Sun* challenges to the additional searches to be without merit, since the initial search of the Georgia Residence was not tainted by any constitutional violations. *See Oregon v. Elstad,* 470 U.S. 298, 308, 105 S.Ct.

1285, 84 L.Ed.2d 222 (1985) ("Since there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed"); *United States v. Crowder,* 62 F.3d 782, 787–88 (6th Cir.1995).

### III. The Search of the Tennessee Residence

 Shutters next appeals the district court's upholding of the warrant issued for the search of the Tennessee Residence. In reviewing a district court's ruling on a motion to suppress, this court will accept the district court's findings of fact unless they are clearly erroneous, but the court will review *de novo* the district court's conclusions of law, such as whether the "good faith" exception applies to a deficient warrant. *United States v. Guimond,* 116 F.3d 166, 169 (6th Cir.1997). When the district court itself is a reviewing court, this court owes the district court's conclusions no particular deference. *United States v. Weaver,* 99 F.3d 1372, 1376 (6th Cir.1996). In deciding whether probable cause exists, we must examine the totality of the circumstances in a "realistic and commonsense fashion." *United States v. Finch,* 998 F.2d 349, 352 (6th Cir.1993).

In this case, the warrant, which incorporated an affidavit sworn by Officer Dale Armour of the THP, describes the premises with particularized detail, setting forth both the dwelling's exact location and its physical appearance. Likewise, it identifies the items to be seized in an equally detailed fashion, and recounts the counterfeiting scheme undertaken by Shutters. However, while the affidavit states that the rooms in the Tennessee Residence were "available to John Doe aka Jim Thompson aka John Van Shutters" (J.A. Vol. II at 12),[3] the affidavit completely neglects to indicate *why* the affiant believed that Shutters himself had any connection with the Tennessee Residence. Shutters argues that the warrant is lacking in probable cause since it fails to state a "nexus between the place to be searched and the evidence

---

3. The Tennessee Residence was owned by a landlord who apparently only knew Shutters as "Jim Thompson."

sought." *United States v. Alix,* 86 F.3d 429, 435 (5th Cir.1996); *United States v. Savoca,* 761 F.2d 292, 297 & n. 8 (6th Cir.1985) (affidavit to warrant must "describe the relationship of the persons to the premises"). In the alternative, Shutters argues that, because of the same deficiency, the warrant was nothing more than a "bare bones" affidavit so facially lacking of probable cause that not even the so-called "good faith" exception of *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) could validate the search.

The government does not spend much effort countering Shutters's charges that the warrant failed to state a nexus between the premises and the criminal activity.[4] Indeed, the government conceded in its brief and at oral argument that "it would have been preferable to specify how the affiant linked the residence to [Shutters.]" Gov't Br. at 10. Instead, the government urges this court to proceed directly to the *Leon* "good faith" analysis.

We have articulated that *Leon* stands for the proposition that "the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Weaver,* 99 F.3d 1372, 1380 (6th Cir.1996)(quoting *Leon,* 468 U.S. at 905, 104 S.Ct. 3405). We have also noted that the "good faith" exception of *Leon* is not boundless and is inappropriate in at least four circumstances:

> [F]irst, if the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," [*Leon,* 468 U.S.] at 914, 104 S.Ct. at 3416; second, if "the issuing magistrate wholly abandoned his judicial role," *id;* third, if the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *id.* at 915, 104 S.Ct. at 3416–17 (citations omitted), or in

other words, where "the warrant application was supported by [nothing] more than a 'bare bones' affidavit," *id.;* and fourth, if the "warrant may be so facially deficient-i.e., failing to particularize the place to be searched or the things to be seized ...," *id.* at 923, 104 S.Ct. at 3421 (citations omitted).

*Weaver,* 99 F.3d at 1380 (brackets added; parentheticals in original). We have defined a "bare bones" affidavit as one that "states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge[.]" *Id.* at 1378.

Shutters does not contend that Armour swore the affidavit in bad faith, or that the magistrate abandoned his role as a neutral arbiter in issuing the warrant. Thus, the question becomes whether the affidavit suffers either of the two remaining maladies as stated above.

Applying a "practical, common sense manner" reading of the warrant, *id.,* we are of the opinion that only a police officer with extraordinary legal training would have detected any deficiencies in that document. First, the affidavit states that the affiant has personal knowledge that Shutters had been "involved in an on-going criminal enterprises [sic.]" J.A. Vol. II at 13. It further describes the suspected criminal activities (fraudulent purchases of automobiles) and the items Shutters used to facilitate his scheme (counterfeit checks, vehicle titles, etc.). Moreover, the affidavit also described the location of the Tennessee Residence with such particularity that a common sense inference is that the affiant visited the premises himself and presumably either observed Shutters in the residence, or determined through investigation that Shutters frequented the premises. Additionally, the affidavit also states that the affiant has been a law enforcement official for 17 years and a Tennessee Highway Patrol Investigator for ten years. *See United States v. Valencia,* 24

---

**4.** The government attempts to rescue the warrant from its lack of nexus deficiencies by pointing out that Armour testified at the suppression hearing that he had personally verified that Shutters lived at the Tennessee Residence. However, this information should have been included in the affidavit. *See Weaver,* 99 F.3d at 1378 ("In determining whether an affidavit is 'bare bones,' the reviewing court is concerned exclusively with the statements contained within the affidavit itself").

F.3d 1106, 1108 (9th Cir.1994) ("The court may take into account the experience and expertise of law enforcement agents who observed the defendant's activity"). Also, the affidavit stated that the suspect had been identified in a photo array by the victims of his crimes. Finally, the fact that Armour himself was the executing officer of the affidavit significantly reduces the danger of the wrong premises being searched. *United States v. Durk*, 149 F.3d 464, 466 (6th Cir. 1998).

This court has applied the good faith exception to warrants supported by far less information than that set forth by Armour. For example, in *United States v. Schultz*, 14 F.3d 1093 (6th Cir.1994), following an investigation of illegal drug transactions, the affiant-officer had "not made any material connection between the bank and any criminal activity," and possessed little more than a hunch "[b]ased on his training and experience," that evidence of the crime would be found in bank safety deposit boxes. *Schultz*, 14 F.3d at 1097–98. Nevertheless, given that the officer had undertaken a thorough investigation of the crime, and given the officer's "training and experience," we held that the affidavit was not "so lacking in indicia of probable cause" under *Leon. Id.* at 1098. A similar result was reached in *Savoca*, in which we applied the good-faith exception of *Leon* to a "terse" affidavit that "established only that two persons known to have been involved in several bank robberies were observed on the same premises [a motel room two thousand miles from the place of the robberies]." *Savoca*, 761 F.2d at 294, 298.

To be sure, we have rejected "bare bones" affidavits even in light of *Leon. See, e.g., Weaver*, 99 F.3d at 1377–78 (affidavit based on anonymous tip lacked particularized incriminating facts and used conclusory statements as well as boilerplate language); *see also United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir.1988) (*Leon* not applied where the affidavit offered "no hint as to why the police wanted to search the residence"). However, in this case, even assuming that the district court's probable cause determination was incorrect, we certainly cannot say that Officer Armour's affidavit was "so lack-ing" as to preclude application of the good faith exception. *Schultz*, 14 F.3d at 1098; *see also United States v. Procopio*, 88 F.3d 21, 28 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 620, 136 L.Ed.2d 543 (1996) (applying *Leon* good faith exception when "only omission [in affidavit] was the failure to explain how the agent—who had ample basis for the contention—knew that '81 Intervale' was 'Kiley's address.' "). We thus agree with the district court that the searches of both residences were constitutionally valid.

## IV. Section 513(a) Conviction

Shutters next contends that his conduct was not sufficient to meet the jurisdictional requirements of the federal counterfeit securities statute, 18 U.S.C § 513(a). The statute provides in pertinent part: "Whoever makes, utters or possesses a counterfeited security ... of an organization ... with the intent to deceive another person, organization or government shall be fined under the title or imprisoned for not more than ten years, or both." 18 U.S.C. § 513(a) (West Supp.1998). The statute defines an "organization" as "a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, society, union, or any other association of persons which affect interstate or foreign commerce[.]" 18 U.S.C. § 513(c)(4) (West Supp.1998). Shutters contends that because his counterfeit checks bore the name of the fictitious entity "First Tennessee Bank Nashville," and because of material differences between his checks and genuine checks issued by FTB, his checks were not a counterfeited security of an "organization" within the meaning of § 513. The government counters that the evidence at trial sufficiently established that Shutters did indeed base his checks on FTB's securities.

■ The parties do not agree on the standard of review for a § 513 conviction. Shutters argues that whether a conviction satisfies all jurisdictional elements of a statute is a question of law to be reviewed *de novo*. The government asserts that the relevant issue is the sufficiency of the evidence to

support a conviction under § 513, and this court should only determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

We are aware that the Ninth Circuit has acknowledged the somewhat paradoxical nature reviewing a conviction under § 513, but declined to ultimately resolve the issue. *See United States v. Barone*, 71 F.3d 1442, 1444 n. 4 (9th Cir.1995). We are of the opinion that the government articulates the proper standard of review in this case. The difficulty with accepting *de novo* review as urged by Shutters is that he necessarily assumes that his checks were not based upon an "organization." We believe that this is a question ·of fact which the jury found against Shutters. Accordingly, we will not set aside that finding unless no rational jury could have found the same.

▆▆ As discussed *supra*, there were differences between Shutters's "First National Bank Tennessee" checks and the genuine FTB checks. Shutters seeks to advance his argument—that he did not pass off counterfeit checks of an "organization"—by citing the Ninth Circuit's decision in *Barone*. In that case, the Ninth Circuit reversed a § 513 conviction because the "organization" upon which the defendant based his counterfeit securities was defunct and, hence, not a "legal entity" affecting interstate commerce as specified by § 513(c)(4). *See Barone*, 71 F.3d at 1444–46.[5] Shutters's reliance on *Barone* is misplaced. The jury heard testimony regarding the differences between Shutters's checks and the FTB securities, and was specifically presented in the jury instructions with Shutters's argument that he did not base his checks on an "organization." The jury found against Shutters on this issue.

We cannot say that these findings were clearly erroneous. At best, the differences proffered by Shutters demonstrate that his checks were imperfect forgeries. Also, the

"First National Bank Nashville" notation is presented in much smaller subscript than the dominant FTB bearing and logo on Shutters's counterfeit checks. It cannot be doubted that Shutters favored the FTB bearing and logo to ensure that his forgeries would be accepted by his victims. Had Shutters placed the "First Tennessee Bank Nashville" heading in a more prominent location, or used the name of a more obvious fictitious entity, such as the "Tenth Tennessee Bank," then Shutters's victims would surely have greeted the checks with more suspicion.

We therefore hold that Shutters was properly convicted of passing counterfeit securities of an organization within the meaning of § 513. A defendant should not be permitted to escape liability under § 513 by resorting to the fine print of his forged creations.

## V. Enhancement for Obstruction of Justice

▆▆ The district court enhanced Shutters's sentence by two levels for obstruction of justice, based on its finding that Shutters asked Linda Ballard to destroy evidence at the Georgia Residence after he had been arrested. *See* U.S.S.G. § 3C1.1 comment, n. 3(d) (1997) ("destroying or concealing or directing or procuring another person to destroy or conceal evidences that is material to an official investigation" warrants enhancement). Shutters denied at the sentencing that he ever directed Ballard to destroy evidence, and also asserted that Ballard was lying when she testified to the contrary at trial. The district court, having observed Ballard's "appearance and demeanor at trial," made the determination that Ballard's testimony was truthful and credible. J.A. at 293–94 (Sentencing Hearing Tr.).

▆▆ A district court's factual findings at a sentencing hearing in relation to application of the Sentencing Guidelines are reviewed for clear error, but application of the Guidelines to the facts of a case are reviewed *de novo*. *United States v. Smart*, 41 F.3d 263, 264 n. 4. (6th Cir.1994). Shutters argues

---

5. The Fourth Circuit has parted company with the Ninth Circuit and sustained a § 513 conviction involving almost identical facts as *Barone*.

*United States v. Pebworth*, 112 F.3d 168, 169–70 (4th Cir.1997).

that the district court essentially found that he committed perjury at the hearing, and that the district court improperly applied the enhancement because it did not identify the specific portions of his testimony which were perjured. *See United States v. Spears,* 49 F.3d 1136, 1143–44 (6th Cir.1995).

Shutters misapprehends the nature of his enhancement. The district court did not enhance Shutters's sentence because it found that he committed perjury, but because it found that he had obstructed justice by directing Ballard to destroy evidence. The district court was presented with conflicting accounts of whether Shutters did or did not attempt to obstruct justice, and determined that Ballard's account was more credible. *See id.* at 1143 (district court must "resolve[ ] the conflict in credibility when a defendant's testimony is directly at odds with that of other witnesses"). Further, the Sentencing Guidelines clearly differentiate between enhancements for suborning perjury and directing another person to destroy evidence. *Compare* U.S.S.G. § 3C1.1 comment, 3(b) (perjury) *with id.* comment, 3(d) (destroying evidence). Shutters simply misunderstands the reason why his sentence was enhanced and, in any event, based upon the district court's findings, the enhancement was proper.

## VI. Denial of Adjustment for Acceptance of Responsibility

Finally, Shutters contends that the district court erred in denying an adjustment to his sentence for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. He argues that he accepted his guilt from the beginning of the trial, was cooperative with the government in its investigation, and only went to trial to challenge the validity of the counterfeit securities charges against him. The district court denied the adjustment because it found that Shutters had not demonstrated any remorse for his crimes, and also because Shutters was untruthful in his testimony at the sentencing hearing.

"The determination of whether a defendant has accepted responsibility is a factual question which should be accorded great deference and should not be disturbed

unless it is clearly erroneous." *United States v. Surratt,* 87 F.3d 814, 821 (6th Cir. 1996). The rationale for such deference to the district court is that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G. § 3E1.1 comment, n. 5 (1997). Moreover, "[t]he defendant bears the burden of showing by a preponderance of the evidence that the reduction is justified." *Surratt,* 87 F.3d at 821.

Shutters points out that the Sentencing Guidelines explicitly state that a defendant does not waive a right to an adjustment by going to trial "to assert and preserve issues that do not relate to factual guilt (*e.g.,* to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." U.S.S.G. § 3E1.1 comment, n. 2 (1997). Shutters also submits that his is an "extraordinary case" in which a downward departure should apply even if we do affirm the enhancement for obstruction of justice.

The district court clearly recognized Shutters's right to contest the applicability of 18 U.S.C. § 513 to his conduct. Specifically, the district court stated that it was aware of Shutters's right to "go to trial and put the government to its proof, testing the legal sufficiency of the evidence as to whether it rises to constitute a commission of a statute under which he's charged, *and I have no quibble about that* [.]" J.A. at 294 (Sentencing Hearing Tr.) (emphasis added). However, after acknowledging Shutters's rights, the district court issued the following finding:

[T]he fact remains that this man has absolutely no remorse. He is a hardened criminal. And he no more has any more remorse for the victims in these cases, the people who were advertising their cars in *Wheels and Deals* or in the Kroger neighborhood market by putting up a sign on the bulletin board, and how he hoodwinked and crooked these people, and the anguish and the suffering, the turmoil they went through[.] . . .

And I credit that aspect of Linda Ballard's testimony. This man has no remorse. He isn't the least bit contrite about having

imposed on these people who were the victims in this case.

J.A. at 294–95 (Sentencing Tr.). The district court made similar findings with regard to Shutters's untruthfulness at the sentencing hearing when he denied having requested that Ballard destroy incriminating evidence at the Georgia Residence. *Id.* at 295–96.

We cannot say that these findings are clearly erroneous, or that Shutters presents us with an extraordinary case warranting application of both a downward departure as well as an enhancement. As the government points out, Shutters initially attempted to conceal his identity to the arresting officers, and only "came clean" after he realized he had been caught. Given the district court's finding of lack of remorse, coupled with its finding that Shutters proffered untruthful testimony at the sentencing hearing to avoid application of the enhancement, we will uphold the district court's denial of the adjustment based upon acceptance of responsibility.

### VII. Conclusion

Because we see no error in the proceedings below, we therefore **AFFIRM** Shutters's conviction and sentence in all respects.