NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0501n.06

Case No. 15-3633

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 25, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| DWIGHT BULLARD, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____ | ) | |

Before: KEITH, CLAY, and WHITE, Circuit Judges.

**DAMON J. KEITH, Circuit Judge.** Dwight Bullard appeals the denial of his motion to suppress evidence seized pursuant to a search warrant. Bullard argues that the warrant to search an apartment lacked probable cause. After holding a suppression hearing, the district court denied Bullard's motion. For the following reasons, we **AFFIRM**.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

On October 24, 2014, a search warrant was issued in the Court of Common Pleas of Lake County authorizing the search of an apartment (the "Bishop Park Apartment") in the City of Willoughby Hills, Ohio.

Lakewood Police Department ("LPD") Detective Amelia Leanza provided information in an affidavit supporting issuance of the warrant.

### A. Allegations in affidavit in support of issuance of warrant

The relevant allegations in the affidavit are as follows:

In September 2014, LPD received information from a confidential source ("CS") about a man with the street name of "Cream White," who was selling heroin in Cuyahoga County. The CS identified the man as Bullard. CS advised that he "requests the purchase of heroin" from Bullard through Bullard's cell phone. Further investigation revealed that Bullard was under supervised probation from the Cuyahoga County Probation Department for a 2013 drug arrest, and that he had been convicted for violations of state drug laws. Bullard listed his residence as 13901 Bartlett Avenue, in Cleveland, to his probation officer.

*a. September 25, 2014: First controlled buy.*

On September 25, 2014, LPD organized a controlled buy. Under Detective Leanza's direction, the CS sent a text message to Bullard asking to buy heroin. The CS received a text message from Bullard, agreeing to the purchase. The CS' person and car were searched and were found to be free of drugs, monies and contraband. The CS was outfitted with audio and video surveillance. The CS was kept under surveillance and followed to a pre-determined location within Cuyahoga County where the CS met with Bullard and bought a substance from him that later field-tested positive for heroin. Immediately after the purchase, the CS then went to a pre-determined location where the heroin was recovered.

Further investigation revealed that two vehicles were registered to Bullard: a 2000 red GMC pick-up truck with an Ohio license plate, and a 2006 black Ford Fusion with an Ohio license plate. Surveillance was conducted at the 13901 Bartlett Avenue address where the red GMC truck was observed parked in the back of the driveway. The residence, however, appeared to be vacant because there were phone books hanging on the front door during the investigation,

which, Detective Leanza stated, corroborated the fact that Bullard "was not, nor was anyone else, actually residing" there. Bullard was observed arriving at this location in a black Ford Fusion with another license plate number.

    *b. October 7, 2014: Second controlled buy.*

On October 7, 2014, the CS advised the LPD that Bullard had been purchasing homes within Cuyahoga County, "rehabbing" them, and renting them out. One such home was located at 6627 Lansing Avenue in Cleveland. Another controlled buy was organized. The CS sent Bullard text messages and placed calls under Detective Leanza's supervision. The CS requested another purchase of heroin, and Bullard agreed to the sale at the house that he was currently rehabilitating. The CS' person and vehicle were fully searched and were found to be free of any drugs, monies, and contraband. The CS was outfitted with audio and video surveillance. The CS was kept under constant and uninterrupted surveillance and followed directly to 6627 Lansing Avenue. The CS entered the residence and completed the sale. Immediately after the purchase, the CS then went to a pre-determined location where the purchased substance, which later field-tested positive for heroin, was recovered. The residence at 6627 Lansing Avenue was observed to be vacant and in the process of remodeling and not in any condition for occupancy.

Detective Leanza stated that video surveillance of both 6627 Lansing Avenue and 13901 Bartlett Avenue revealed that Bullard was not living at these addresses. Bullard was also never seen coming from either address to conduct the controlled buys. A data base search of the National Vehicle Location Service was conducted on the black Ford Fusion's license plate. On September 27, 2014 and on October 1, 2014, the black Ford Fusion was shown to be parked at 27700 Bishop Park Drive. On October 9, 2014, surveillance was conducted at Bishop Park Drive, and the black 2006 Ford Fusion was parked on the south side of the apartment building.

Bullard was observed exiting the rear door of the apartment building and entering the Ford Fusion. On October 16, 2014, in the early morning hours, the black 2006 Ford Fusion was again observed to be parked on the south side of the apartment building. Detective Leanza spoke with the management at the apartment complex. Management indicated that Bullard's name was not listed on a lease, but advised that he could be staying there with another resident. Detective Leanza was provided access to the complex's video surveillance room. Presumably that same day, at 10:19 a.m., Bullard was observed leaving the Bishop Park Apartment. Later, it was learned that the Bishop Park Apartment was "rented to Alisa Maiorano for her daughter, Angel LaQuatra."

   c. *October 17, 2014: Third controlled buy.*

   On October 17, 2014, the CS arrived at the LPD. A controlled buy was organized while at the same time surveillance was conducted at 27700 Bishop Park Drive. The black Ford Fusion was found parked on the south side of the building. The CS placed a series of monitored phone calls and text messages to Bullard's cell phone number. A woman, believed to be Angel LaQuatra, was observed leaving the Bishop Park Apartment with a small child. After she left with the child, Bullard was observed exiting the Bishop Park Apartment, locking the door behind him using a key, and, while waiting for the elevator, he appeared to make a phone call from his cell phone. At the same time, the CS received a phone call from Bullard advising the CS as to where they should meet to consummate the sale. Bullard was followed by officers from 27700 Bishop Park Drive directly to 6627 Lansing Avenue. The CS was kept under constant supervision and followed directly to 6627 Lansing Avenue, where he pulled into the driveway there. The CS entered the residence at 6627 Lansing Avenue just after Bullard had arrived. The CS left and was followed directly to a pre-determined location where the purchased substance,

which later field-tested positive for heroin, was recovered. The CS' person and vehicle were again fully searched and found to be free of any additional drugs, monies, and contraband. The CS further advised that Bullard had a "baggie in his pocket with numerous pre-packed rocks of heroin." Bullard had sold the CS heroin from this bag of pre-packed heroin. The CS further advised that another male, known to Detective Leanza, was inside the residence during the transaction. The male was already there by the time Bullard arrived and used heroin in the CS' presence.

   d.   *October 22, 2014: Fourth controlled buy.*

On October 22, 2014, the CS arrived at the LPD again. Another controlled buy was organized, while at the same time surveillance was conducted at 27700 Bishop Park Drive. The black Ford Fusion was found parked on the south side of the building. Under the direction and control of the LPD, the CS placed a series of controlled and monitored text messages to Bullard's cell phone. Bullard remained inside the Bishop Park Apartment throughout the exchange of the controlled and monitored text messages. Angel LaQuatra was observed exiting the apartment with the small child. Bullard exited the same apartment and then locked the door behind him. He descended the stairwell and walked out the rear door of the apartment building. Bullard entered the black Ford Fusion, and he left the complex.

As Bullard left the complex, the CS received a text message from Bullard's cell phone agreeing to complete the transaction at a named location within Cuyahoga County. The CS' person and vehicle were fully searched and found to be free of any drugs, monies and contraband. The CS was outfitted with audio and video surveillance equipment. Bullard was followed by officers from 27700 Bishop Park Drive directly to 6627 Lansing Avenue. Bullard was observed completing a "hand to hand" transaction with another man in the driveway.

Bullard then entered the black Ford Fusion and departed the driveway, "never having gone into 6627 Lansing [Avenue.]" As he departed the driveway, the CS received a phone call from Bullard's cell phone, and Bullard advised that he was on his way and gave directions regarding the meeting location. *Id.* Bullard met with the CS. The "hand to hand" transaction was completed in direct view of a LPD detective. The CS left and was followed directly to a pre-determined location where the purchased substance, which later field-tested positive for heroin, was recovered. After the transaction, the CS' person and vehicles were again fully searched and found to be free of any additional drugs, monies, and contraband.

### B. The search of the Bishop Park Apartment

The court issued a search warrant on October 24, 2014 for the Bishop Park Apartment. The LPD executed the search warrant on October 28, 2014. That same day, but before the search, Bullard was arrested pursuant to an arrest warrant in the parking lot and was read his *Miranda*[1] rights. Officers knocked and announced at the apartment door with Bullard. After the knock went unanswered, entry was gained into the apartment using Bullard's key. Officers brought Bullard into the apartment where 52 bags of heroin were removed from his underwear. When asked if he was keeping any drugs in the apartment, Bullard said everything was in the safe. The key to the safe was located on Bullard's key ring, and he voluntarily provided the digital combination. Upon the law enforcement officials' seizure of the items, Bullard signed an inventory of items seized at the apartment.

### C. Bullard's suppression motion

After being indicted on November 13, 2014, Bullard filed a motion to suppress the evidence seized. A suppression hearing was held on January 6, 2015, during which the district court denied the motion. The district court ruled that probable cause existed to support the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

issuance of the warrant, and indicated that the good-faith exception under *Leon*[2] applied. Bullard later pled guilty to possession with intent to distribute heroin and to being a felon in possession of a firearm and ammunition. Judgment was entered on May 22, 2015. On June 1, 2015, Bullard appealed the order denying his motion to suppress.

## II. STANDARD OF REVIEW

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Beauchamp*, 659 F.3d 560, 565–66 (6th Cir. 2011). The question of whether the district court properly applied the good-faith exception under *Leon* to the search warrant is a conclusion of law that we review de novo. *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006). Barring an exception not applicable here, "a determination of good-faith reliance . . . must be bound by the four corners of the affidavit." *Id.* at 487 (quoting *United States v. Laughton*, 409 F.3d 744, 751 (6th Cir. 2005)); *see also United States v. Frazier*, 423 F.3d 526, 535 (6th Cir. 2005) (discussing limited exception).

## III. ANALYSIS

### A. Probable cause

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause supports a search warrant when the underlying affidavit 'creates a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Powell*, 603 F. App'x 475, 476 (6th Cir.), *cert. denied*, 136 S. Ct. 107 (2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

---

[2] *United States v. Leon*, 468 U.S. 897 (1984).

In reviewing the affidavit, this court's "duty . . . is simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (citation omitted). A "substantial basis exists when the affidavit shows some underlying circumstances which could lead a man of reasonable caution to conclude that evidence of a federal crime will probably be found in the place to be searched." *United States v. Giacalone*, 541 F.2d 508, 513 (6th Cir. 1976). If the warrant is deemed invalid, "[c]ourts ordinarily must suppress evidence obtained pursuant to [it] . . . this rule is called the 'exclusionary rule.'" *Powell*, 603 F. App'x at 476.

## B. *Leon*'s good-faith exception

The Supreme Court has created a "good-faith exception"—or, the so-called *Leon* exception—to the exclusionary rule. *Id.*; *see also Leon*, 468 U.S. at 913. "The exclusionary rule does 'not bar the government's introduction of evidence obtained by police officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated.'" *United States v. McPhearson*, 469 F.3d 518, 525 (6th Cir. 2006) (quoting *Laughton*, 409 F.3d at 748).

"*Leon* stands for the proposition that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (citation omitted). But the *Leon* exception is by no means "boundless," and there are at least four circumstances in which the exception does not apply:

> (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;
>
> (2) if the issuing magistrate wholly abandoned his judicial role;
>
> (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or in

other words, where the warrant application was supported by [nothing] more than a 'bare bones' affidavit;

(4) if the warrant may be so facially deficient—i.e., failing to particularize the place to be searched or the things to be seized—the executing officers cannot reasonably presume it to be valid;

*See Van Shutters*, 163 F.3d at 337 (quoting *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (internal quotation marks omitted); *see also Leon*, 468 U.S. at 914, 915, 923. As explained below, the focus of our inquiry in this appeal is the third exception—namely whether the "affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.*

For purposes of the third exception, we first note that official belief in the existence of probable cause must be *objectively* reasonable. *See Laughton*, 409 F.3d at 750 ("[T]he test for good faith reliance . . . is an objective one [and] does not permit consideration of the executing officer's state of mind."). The showing required to establish that reliance was "objectively reasonable" is less than the "substantial basis" showing required to establish probable cause. *See Hython*, 443 F.3d at 484 (citing *Carpenter*, 360 F.3d at 595). "[I]t is entirely possible that an affidavit could be insufficient for probable cause but sufficient for good-faith reliance." *Id.* (quoting *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004)). The required showing for the third exception primarily relates to "whether an affidavit established a sufficient nexus between illegal activity and a place to be searched." *Id.*

In determining the applicability of the good-faith exception, we need not decide whether the warrant supported a finding of probable cause. *See Powell*, 603 F. App'x at 476; *United States v. Washington*, 380 F.3d at 240 (assuming without deciding that probable cause did not

exist given that good-faith exception clearly applied); *see also United States v. Sinclair*, 631 F. App'x 344, 349 (6th Cir. 2015).[3]

## C. Merits of Bullard's appeal

On appeal, Bullard argues that the affidavit did not support a finding of probable cause. Appellant Br. 12. In response to the government's argument that the good-faith exception under *Leon* applied, *see* Appellee Br. 25, Bullard argues that the requisite nexus between the place sought to be searched—i.e., the Bishop Park Apartment—and the criminal activity is lacking, Reply Br. 3; put another way, Bullard's argument relates to the third exception under *Leon*. *See Laughton*, 409 F.3d at 749 (determining, for purposes of the third exception, whether there is "some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched."); *Washington*, 380 F.3d at 243 (determining whether the affidavit "included enough facts with respect to the nexus between the criminal activity" and the residence to be searched to "overcome the 'so lacking' hurdle.").

This case boils down to whether the affidavit contains some "modicum of evidence" to support a connection between the Bishop Park Apartment and the drug trafficking activity. *See Laughton*, 409 F.3d at 749. We conclude that it does. *See, e.g.*, *United States v. Warren*, 365 F. App'x 635, 637 (6th Cir. 2010). On October 17, 2014, Bullard was observed exiting the Bishop Park Apartment, locking the door behind him using a key, and, while waiting for the elevator, he appeared to make a phone call from his cell phone. At the same time, the CS received a phone call from Bullard, advising the CS as to where they should meet to consummate the sale. Bullard was then followed directly to the site of the sale. Then, on October 22, 2014,

---

[3] While the parties briefed the *Leon* issue on appeal, we note that they did not brief the issue before the district court. However, the district court *sua sponte* addressed the issue at the suppression hearing. Thus, the issue is not forfeited, and we may resolve this appeal on this ground. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011) ("[T]here can be no forfeiture where the district court . . . addressed the merits of the issue.").

Bullard was observed exiting the Bishop Park Apartment, locking the door behind him using a key, entering the black Ford Fusion, and leaving the complex. As Bullard left the complex, the CS received a text message from Bullard's cell phone agreeing to complete the sale of the heroin at a particular location. Bullard was again followed directly to the site of the sale.

We have concluded that the application of the good-faith exception under similar circumstances was proper. *See, e.g.*, *Warren*, 365 F. App'x at 637 (concluding that the good-faith exception was "satisfied" because, according to the affidavit, the officer observed "[the defendant's] exit from the residence and immediate sale of cocaine to a confidential informant one block away"); *United States v. Bracey*, 381 F. App'x 580, 583 (6th Cir. 2010) (concluding that the good-faith exception applied in part because the officer observed the defendant "traveling directly" from the residence "to what appeared to be drug transactions"); *Washington*, 380 F.3d at 243 (concluding that the good-faith exception applied in part because the defendant was observed "emerg[ing]" from the residence "immediately" before conducting the second of two drug deals); *see also Van Shutters*, 163 F.3d at 336–37 (concluding that the good-faith exception applied even though the affidavit merely noted that the residence was "available" to the defendant and it failed to "indicate *why* the affiant believed that [the defendant] himself had any connection with the . . . [r]esidence").[4]

Accordingly, *Leon*'s good-faith exception applies to the facts of this case.

---

[4] Bullard also argues that "there is no evidence that [Detective Leanza] sought any legal advice by government attorneys before presenting the affidavit to the state court, as did the affiant in *Leon*." Reply Br. 3–4. So, Bullard contends, application of the *Leon* exception is improper. *Id.* Although Bullard is correct in noting that district attorneys reviewed the affidavit at issue in *Leon*, *see* 468 U.S. at 902, Bullard has not cited any case— binding or otherwise—that holds that review of an affidavit by a government attorney is a prerequisite to a finding that the good-faith exception applies, and we are aware of none.

## IV.    CONCLUSION

For these reasons, we **AFFIRM** the district court's denial of Bullard's motion to suppress.

**HELENE N. WHITE, Circuit Judge, concurring.** I do not disagree with the majority's *Leon* analysis, but find that analysis unnecessary because the search warrant is supported by probable cause.

The affidavit provides detailed facts relating to Bullard's activities that support an inference that drugs would be found at the Bishop Park apartment. Through surveillance, officers established that Bullard was not living at the address listed on his probation paperwork or at other possible addresses. Detective Leanza averred that, in his experience, it is common for drug traffickers to conceal their residence to avoid warrantless searches while on active probation, as Bullard was. Bullard's vehicle was found at the Bishop Park apartment during early morning hours on several occasions, suggesting that he resided there. Officers twice witnessed Bullard leave the Bishop Park apartment, lock the door with a key, and then meet with the informant and others to sell them heroin. During one of these controlled buys, Bullard sold the informant heroin without entering another residence. During the other controlled buy, Bullard completed the drug deal inside the Lansing Avenue address where other drug users were present, but Detective Leanza stated that in his experience, it would be uncommon for drug traffickers to keep drugs at a residence where other drug users were present. Detective Leanza also detailed his experience as a narcotics officer and Bullard's status as a previous drug offender and observed dealer.

Given Bullard's ties to the apartment, his status as a known drug dealer, and the observations of Bullard leaving the apartment to engage in drug transactions, there was sufficient reliable information presented for the issuing judge to make the common-sense inference that drugs would be found at the Bishop Park apartment.