RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0242p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALBERT DAJUAN WHITE,

*Defendant-Appellant.*

No. 15-5793

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 2:14-cr-20018-1—John Thomas Fowlkes, Jr., District Judge.

Decided and Filed: October 27, 2017

Before: GILMAN, GRIFFIN, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Dennis J. Clark, CLARK LAW FIRM PLLC, Detroit, Michigan, for Appellant.
Samuel R. Stringfellow, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for
Appellee.

GRIFFIN, J., delivered the opinion of the court in which GILMAN, J., joined.
STRANCH, J. (pp. 22–34), delivered a separate dissenting opinion.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge. After a narcotics officer watched defendant Albert White sell
marijuana to an undercover informant in the driveway of White's home, the officer sought a
search warrant for the residence. His affidavit recounted the recent drug deal, a confidential tip
that White was selling marijuana from the residence, defendant's previous drug offenses, and the

fact that defendant keeps pit bulls "at his residence." Defendant argues that this information is so lacking in indicia of probable cause that no reasonable officer would believe there was probable cause to search his home. We disagree and affirm his convictions and sentences.

I.

In October 2013, narcotics investigator Brandon Williams received information from a confidential source that Albert White was selling marijuana from 196 Turner Lane in Covington, Tennessee. Williams enlisted the confidential source to execute a "controlled buy" from White. Equipped with a recording device and $250 in buy money, the confidential source met White in the driveway of 196 Turner Lane. When he arrived, defendant was already sitting in his white truck, where the confidential source joined him to consummate the deal. Following the exchange, defendant drove off and the confidential source rendezvoused with Williams, who was staked out nearby monitoring the transaction. After reviewing the footage and conducting some additional investigation, Williams prepared an affidavit in support of a search warrant for 196 Turner Lane. In addition to recounting Williams' law-enforcement and narcotics-investigation experience, the affidavit stated:

> Investigator Brandon Williams received information that marijuana was being sold from 196 Turner Lane in Covington, TN 38019 in Tipton County, TN by a black male identified as Albert Dajuan White. Investigator Brandon Williams initiated a controlled purchase of marijuana with the use of a confidential source from the residence. Investigator Brandon Williams placed audio and video on the confidential source. The confidential source then proceeded to 196 Turner Lane in Covington, TN[,] Tipton County, TN. Investigator Brandon Williams observed the confidential source pull into the driveway of 196 Turner Lane in Covington, TN 38019 in Tipton County, TN and pull up next to a white Chevrolet truck where Albert White gave the confidential source the marijuana for the previously recorded drug fund money. Investigator Brandon Williams then observed the white Chevrolet truck leave the residence with Albert White driving the vehicle. The confidential source then left the residence and met with Investigators where the marijuana was recovered. The transaction was captured on an audio and video device. This incident occurred in Tipton County, TN. in the last seventy-two hours. A sudden and forceful entry is clearly necessary for the safety of Deputies, residents, or other nearby persons or property due to Albert Dajuan White's extensive criminal history consisting of Evading Arrest, Resisting arrest, and numerous possessions of SCH II and VI. Albert is also known to have dogs believed to [be] pit bulls at his residence.

Persuaded that the foregoing was sufficient to establish probable cause, a local state court judge issued a search warrant. The ensuing search uncovered over a pound of marijuana, a firearm, ammunition, and roughly $32,000 in cash, some of which was traced to the controlled buy.

White was indicted on drug and firearm-possession charges and moved to suppress the evidence seized from his residence, arguing that the affidavit failed to establish probable cause to believe that contraband would be found there. No reasonable officer would have believed otherwise, defendant also contended, because "the affidavit is so facially defective given that no time or date is stated as to when the alleged criminal activity took place." A magistrate judge issued a report, recommending that the district court deny the motion because the affidavit established probable cause and, in any event, it was not so lacking in that department that the good-faith exception would apply. The district court agreed with defendant that the affidavit failed to establish probable cause. However, noting defendant's failure to object to the magistrate's good-faith ruling, the district court held that the magistrate judge's good-faith analysis was sound and denied the motion.

Defendant proceeded to trial, where a jury found him guilty of being a felon in possession of a firearm and felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). The district court sentenced him to 33 months in prison, concurrent with an on-going state sentence for the violation of his probation.

Defendant's appeal presents two issues: first, whether the district court erred in denying his motion to suppress, and second, whether the district court committed plain error in failing to specify the "start date" for his federal sentence or adjusting it under U.S.S.G. § 5G1.3(b).

II.

In the motion-to-suppress context, this court reviews the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Washington*, 380 F.3d 236, 240 (6th Cir. 2004).

Typically, this court reviews only those issues adequately preserved for appeal.  When a party neglects to advance a particular issue in the lower court, or fails to lodge a specific objection to a particular aspect of a magistrate judge's report and recommendation, we consider that issue forfeited on appeal.  *United States v. Archibald*, 589 F.3d 289, 295–96 (6th Cir. 2009); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  Both types of forfeiture could apply in this case.  In the district court, defendant neglected to make the assertions of lack of good-faith he advances on appeal, and, perhaps more fatally, he failed to object to the magistrate's good-faith analysis, something both the government and the district court noted below.

Nevertheless, our forfeiture rule is not inflexible.  Like other procedural rules, it too is susceptible to abandonment, *see Washington*, 380 F.3d at 240 n.3, and for whatever reason, the government has decided not to pursue this forfeiture issue on appeal.  Loath to raise issues for the parties, much less resolve cases on them, we therefore proceed to the merits. *Cf. DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006) ("Our function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order.").

III.

Defendant argues that the district court erred in denying his motion to suppress.  Though it correctly held that the affidavit lacked probable cause, he claims that the district court erred in ruling that the good-faith exception applied.  The government does not challenge the district court's probable-cause ruling, arguing instead that the affidavit plainly qualifies for the good-faith exception.  We therefore proceed to the good-faith inquiry, assuming, without deciding, that the affidavit failed to establish probable cause.

A.

In *United States v. Leon*, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."  468 U.S. 897, 905 (1984).  In a break from the previously reflexive and uncompromising approach of excluding all evidence seized without probable cause, the Supreme

Court established a new objective inquiry limiting suppression to circumstances in which the benefits of police deterrence outweigh the heavy costs of excluding "inherently trustworthy tangible evidence" from the jury's consideration. *Id.* at 907. Following *Leon*, courts presented with a motion to suppress claiming a lack of probable cause must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) (quoting *Leon*, 468 U.S. at 923 n.23). Only when the answer is "yes" is suppression appropriate.

To aid courts in resolving this question, *Leon* outlined four circumstances in which an officer's reliance would *not* be objectively reasonable. *Leon*, 468 U.S. at 914–15, 923. We deal here with the third scenario: when the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)).[1]

An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a "bare bones" affidavit. *See United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996). A bare-bones affidavit, in turn, is commonly defined as one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *Weaver*, 99 F.3d at 1378). Put more simply, a bare-bones affidavit is a conclusory affidavit, one that asserts "only the affiant's belief that probable cause existed." *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000) (quoting *United States v. Finch*, 998 F.2d 349, 353 (6th Cir. 1993)). It provides nothing more than a mere "guess that contraband or evidence of a crime would be found," *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994), either "completely devoid" of facts to support the affiant's judgment that probable cause exists, *United States v. Carpenter*, 360 F.3d 591, 595–96

---

[1]Defendant also mentions the fourth exception to *Leon*—"where [a] warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid." *See Washington*, 380 F.3d at 241. However, the body of his argument focuses solely on the contents of the affidavit, which suggests to us that he conflated the *warrant* with the *supporting affidavit*. The "facially deficient" exception pertains to the former, not the latter. *See Leon*, 468 U.S. at 923 ("a *warrant* may be so facially deficient . . . ."). Thus, *Leon*'s fourth exception is inapplicable.

(6th Cir. 2004) (en banc), or "so vague as to be conclusory or meaningless." *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (quoting *Carpenter*, 360 F.3d at 596).

In contrast, an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains "a minimally sufficient nexus between the illegal activity and the place to be searched." *Carpenter*, 360 F.3d at 596. If the reviewing court is "able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and official reliance on it is reasonable. *Laughton*, 409 F.3d at 749–50.

A bare-bones affidavit should not be confused with one that lacks probable cause. An affidavit cannot be labeled "bare bones" simply because it lacks the requisite facts and inferences to sustain the magistrate's probable-cause finding; rather, it must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it. *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003). The distinction is not merely semantical. There must be daylight between the "bare-bones" and "substantial basis" standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function. *See Leon*, 468 U.S. at 906–07, 913–21; *Carpenter*, 360 F.3d at 595. Only when law enforcement officials operate in "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights" will the "heavy toll" of suppression "pay its way." *Davis v. United States*, 564 U.S. 229, 237–38 (2011) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009), and *Leon*, 468 U.S. at 908 n.6). Otherwise, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," excluding evidence recovered as a result of a technically deficient affidavit serves no useful purpose under the exclusionary rule. *Id.* at 238 (quoting *Leon*, 468 U.S. at 909, 919). We must therefore find that the defects in an affidavit are apparent in the eyes of a reasonable official before faulting an executive official for complying with his or her duty to execute a court-issued order. *Leon*, 468 U.S. at 921 ("[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law." (quoting *Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring))).

B.

With that legal background in mind, we turn now to the affidavit in this case. Distilled to its essence, it states that, after receiving information that defendant was selling drugs from 196 Turner Lane, Williams verified that tip by conducting a controlled buy on the premises of the residence and investigating defendant's criminal history and connection to the residence. Taken together, these factual components establish a "minimally sufficient nexus" between defendant's drug-distribution activity and the residence at 196 Turner Lane.

To begin, the informant's tip does provide *some* connection between drug distribution and the residence at 196 Turner Lane. For instance, the tip was not a broad allegation that defendant was selling drugs generally. Rather, it identified the precise address at which the criminal activity was occurring, a pertinent factor in establishing a minimal nexus, to say nothing of probable cause. *See Carpenter*, 360 F.3d at 594 ("[T]he circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'").

More critical, however, are Williams' additional investigative steps, beginning with the controlled buy from defendant on the premises. By corroborating key components of the informant's tip—that defendant was personally distributing the specific kind of narcotic (marijuana) at the specific location (the premises of 196 Turner Lane) alleged by the informant— Williams' affidavit provided a concrete factual link between defendant, his criminal activity, and the residence.

Other facts bolster this nexus. First, Williams discovered that defendant had "numerous" drug convictions, lending further credence to the informant's tip that defendant's narcotics activity was ongoing and that the controlled buy was not an aberration. Second, he stated that it was known that defendant kept pit bulls "at his residence," raising the inference that the home at 196 Turner Lane was the site of his drug distribution activity.

Far from being "completely devoid" of facts or consisting solely of "suspicions, beliefs, or conclusions," *Laughton*, 409 F.3d at 748–49, Williams' affidavit contains sufficient factual content that, when taken together and read in a common-sense, practical manner, establishes "*some* connection," *id.* at 750, some "minimally sufficient nexus," *Carpenter*, 360 F.3d at 596,

between suspected drug distribution and the residence. Williams saw defendant sell drugs on the premises of a residence, indicated that the residence was defendant's by referencing what he had inside, and demonstrated that the sale was not an aberration by documenting defendant's previous drug convictions—all of which corroborated an informant's tip that defendant was selling drugs from the residence. Based on these facts, we cannot say that there were "no reasonable grounds for believing that the warrant was properly issued." *Helton*, 314 F.3d at 824 (citing *Leon*, 468 U.S. at 923).

## C.

A survey of our case law confirms this conclusion. First, Williams' affidavit looks nothing like the prototypical bare-bones affidavits first identified by the Supreme Court. Second, this court's good-faith jurisprudence allows a reasonable officer to indulge inferences that would otherwise be insufficient to establish probable cause, several of which may be drawn from Williams' affidavit. And third, this court has sustained a magistrate's probable-cause finding based on similar, though not identical, affidavits.

## 1.

The prototypical examples of *Leon*'s bare-bones affidavit come from *Nathanson v. United States*, 290 U.S. 41 (1933), and *Aguilar v. Texas*, 378 U.S. 108 (1964). *See Leon*, 468 U.S. at 915. In *Nathanson*, the affiant stated under oath that "he has cause to suspect and does believe that" liquor illegally brought into the United States "is now deposited and contained within the premises" belonging to the defendant. 290 U.S. at 44. In *Aguilar*, the affiants stated that they "received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law." 378 U.S. at 109 (footnote omitted). These affidavits were wholly inadequate—what we would call "bare bones" nowadays—because they presented "a mere affirmation of suspicion and belief without any statement of adequate supporting facts." *Nathanson*, 290 U.S. at 46; *Aguilar*, 378 U.S. at 113–14; *see also Illinois v. Gates*, 462 U.S. 213, 239 (1983) (stating that the warrants were issued based on "mere ratification of the bare conclusions of others").

The affidavit in this case bears no resemblance to the *Nathanson* and *Aguilar* affidavits. Williams did not merely assert that he has "cause to suspect and does believe" evidence of drug distribution was located at White's residence, *cf. Nathanson*, 290 U.S. at 44, nor did he say that he has it on "reliable information from a credible person" that defendant was selling drugs from his residence, *cf. Aguilar*, 378 U.S. at 109. Simply put, unlike the affiants in *Nathanson* and *Aguilar*, Williams did not ask the magistrate to simply take his word for it. Rather, he showed his work, explaining that White engaged in a recorded drug deal on the premises, that White had a history of drug offenses, and that White had dogs inside the residence. And those facts, while perhaps not enough to give the magistrate a substantial basis to find probable cause, nonetheless supplied "*some* connection, regardless of how remote," between White, his drug-distribution activities, and 196 Turner Lane. *See Laughton*, 409 F.3d at 750.

Of course, the affidavits in *Nathanson* and *Aguilar* do not represent the universe of unacceptable affidavits, but if we are to keep faith with the prototypes from those cases, Williams' affidavit cannot fairly be called "bare bones."

2.

Our good-faith jurisprudence provides additional support for our conclusion, giving insight into the type of reasonable inferences that this court will indulge when analyzing an officer's objective reliance on an affidavit. For instance, in *United States v. Van Shutters*, an investigation into the defendant's multistate counterfeiting scheme led law enforcement to request search warrants for two residences, one in Georgia and another in Tennessee. 163 F.3d 331, 335–37 (6th Cir. 1998). The affidavit relating to the Tennessee residence recounted the defendant's counterfeiting scheme, the specific items to be seized, and it provided a detailed description of the residence. *Id.* at 336. The affidavit also stated that "rooms in the Tennessee Residence were available" to the defendant, but "completely neglect[ed] to indicate *why* the affiant believed that Shutters himself had any connection with the Tennessee Residence." *Id.* This proved detrimental to sustaining the magistrate's probable-cause finding, but was not so fatal as to make official reliance on the warrant unreasonable. *Id.* at 337. Given the particularity with which the affiant described the residence, we held that a reasonable officer would draw the "common sense inference" that the affiant "visited the premises himself and presumably either

observed Shutters in the residence, or determined through investigation that Shutters frequented the premises." *Id.*

Similarly, in *Carpenter*, officers conducting aerial surveillance "spotted patches of marijuana growing in fields approximately 900 feet away from a residence belonging to [the defendant]." 360 F.3d at 593. They also observed "beaten paths leading from the back door of the residence to the marijuana patches." *Id.* Sitting en banc, this court held that the affidavit's facts "were too vague to provide a substantial basis for the determination of probable cause," but they "were not so vague as to be conclusory or meaningless." *Id.* at 596. In fact, because the affidavit "noted both that the marijuana was growing 'near' the residence and that 'there is a road connecting' the residence and the marijuana plants," we could not say that it was "completely devoid of any nexus between the residence and the marijuana that the police observed." *Id.* at 595–96. Accordingly, the good-faith exception applied.

The takeaway from these cases is that reasonable inferences that are not sufficient to sustain probable cause in the first place may suffice to save the ensuing search as objectively reasonable. For instance, vaguely asserting that a suspect had access to rooms in a particular residence will not establish probable cause to search that residence, but providing some factual detail about the residence permits an officer to reasonably infer that there is factual support for the assertion. *See Van Shutters*, 163 F.3d at 336–37. We have also long accepted the reasonable inference that drug contraband is likely to be found inside drug traffickers' homes, especially when there is evidence of drug activity near or around the home. *See, e.g., United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008); *see also United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009). Though there must be sufficient factual support for the inference in order to establish probable cause, so long as the factual content is not "so vague as to be conclusory or meaningless," that inference is sufficient to permit reasonable reliance on the warrant. *See Carpenter*, 360 F.3d at 595–96.

A reasonable officer is entitled to draw the same inferences from the affidavit in this case. Much like the affidavit in *Van Shutters*, Williams' affidavit did not explicitly state that "196 Turner Lane is defendant's residence." But *Van Shutters* indulged the inference that the residence was, in fact, the defendant's based on the averring officer's description of the

residence. 163 F.3d at 337–38. We must do the same. Williams' description of what White kept inside the residence and what he did in its driveway allows for the reasonable, albeit not airtight, inference that the residence was, in fact, White's. Moreover, the inference we drew in *Carpenter*—that evidence of drug trafficking will be found in the residence around which the suspect has engaged in drug activities—also justifies reasonable reliance on Williams' affidavit, perhaps with even greater force since the location of White's illegal activity occurred on the very premises of the place to be searched—we need not rely on a 900-foot path to make the connection. *See* 360 F.3d at 595–96.

3.

Finally, it is also useful to consider our probable-cause precedent; after all, that is the lens through which we evaluate an officer's reasonable reliance on an affidavit. *See Leon*, 468 U.S. at 923 (evaluating reasonable reliance based on the "indicia of probable cause"). Several cases are especially instructive. In *United States v. Smith*, 783 F.2d 648, 649 (6th Cir. 1986), the affiant "received information from a reliable informant that Eric Helton was producing marijuana at his residence." Acting on that tip, the affiant went to the location and "observed a marijuana plant growing beside the residence." *Id.* The defendant, an occupant of the house, moved to invalidate the search warrant for the residence. We agreed that "[t]he informant's tip alone would not have been sufficient," but concluded that the affidavit, "[t]hough sketchy," established probable cause because "the investigation of the tip did corroborate what [the affiant] had been told." *Id.* at 650–51. Even granting defendant the reasonable assumption that *Smith*'s "sketchy" affidavit represents the irreducible minimum of probable cause, no officer would suspect that an affidavit based on a similar tip but containing *more* probative corroboration—observation of actual drug distribution, past drug offenses, and a factual connection to the residence—was somehow *so* lacking in indicia of probable cause that he could not reasonably rely on it.

Even more factually analogous is our decision in *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998). In that case, police obtained a search warrant for a residence based on information that (1) a confidential informant made six controlled buys on the premises, (2) two of the buys were audio recorded, and (3) the informant saw the defendant in possession of a distribution quantity of cocaine on the premises in the last 72 hours. *Id.* at 974. The defendant

challenged the probable cause underlying a search warrant because "neither the confidential informant nor the law enforcement officer . . . had been inside the house and, therefore, could not have possibly observed any evidence of illegal drug activity therein." *Id.* The defendant argued that the affidavit's reference to the "premises" was insufficient to establish a connection to the house because "the alleged events actually had taken place in the driveway or in Jones's car." *Id.* This court disagreed, holding that the three facts recited above, in conjunction with the principle that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live," supported a finding of probable cause to search the residence. *Id.* at 975 (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). Particularly relevant here, we added: "the fact that the incidents referred to in the affidavits took place on the premises rather than inside the house does not invalidate the search of the house." *Id.* at 974–75.

*Jones* is not an anomaly in our probable-cause jurisprudence. In *Frazier*, this court observed that there is "a series of cases which hold that an informant's observation of drug trafficking outside of the dealer's home can provide probable cause to search the dealer's house." 423 F.3d at 532–33 (citing *United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002); *United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000); *Jones*, 159 F.3d at 974; *United States v. Caicedo*, 85 F.3d 1184, 1193 (6th Cir. 1996)). And in *United States v. Berry*, this court observed that "there is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home." 565 F.3d at 339 (citations omitted); *see also United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (finding probable cause despite the fact that "the affidavit d[id] not state that officers observed drugs or evidence going into or out of his residence").

This precedent all but compels the conclusion that the affidavit in this case qualifies for the good-faith exception. In *Jones*, a confidential informant supplied information that the defendant was selling drugs from a particular address, police conducted a controlled buy in the driveway of that address—though they never observed illegal activity inside the residence—and they sought a warrant within 72 hours. 159 F.3d at 974. If those facts and the accompanying inference that "evidence [of a drug distribution] is likely to be found where the dealers live," were sufficient to sustain the magistrate's probable-cause finding in *Jones*, it follows, *a fortiori*,

that the substantially identical facts in this case are sufficient to satisfy the "less demanding" bare-bones standard. *Laughton*, 409 F.3d at 748. The same goes for *Frazier* and *Berry*: If "an informant's observation of drug trafficking outside of the dealer's home," *Frazier*, 423 F.3d at 532–33, and "status as a drug dealer plus observation of drug activity near defendant's home," *Berry*, 565 F.3d at 339, are sufficient to establish probable cause, it necessarily follows that they are sufficient to meet the "less demanding" minimal-nexus standard of *Leon*'s good-faith exception, *Laughton*, 409 F.3d at 748. In light of this precedent, no reasonable officer could have suspected that the affidavit in this case—which related a first-hand observation of drug distribution by a reputed drug dealer with prior drug offenses on the premises of his residence— was beyond the constitutional pale.

4.

The dissent does not agree. It finds each one of these cases distinguishable for one reason or another, and instead finds other cases, namely those that have declined to apply the good-faith exception, more analogous. Fundamentally, it is important to highlight what we see as the root cause for the disagreement in this case: our different approaches to reading affidavits under the good-faith analysis. Absent *Leon*'s good-faith exception, the ambiguities that the dissent points out might lead to a different outcome. But such is not the state of the law.

To determine whether a reasonable officer would rely on a judicially authorized warrant, a reviewing court must read the affidavit reasonably. That means a court must read it holistically, examining the totality of the circumstances and employing a healthy dose of common sense. *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001). If an inference is obvious from the factual context, a reviewing court should indulge it. *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

The dissent, however, does not read Williams' affidavit this way. The dissent makes every effort to resist the natural reading of the affidavit, parsing it line-by-line in a way that a reasonable officer wouldn't. *Cf. Greene*, 250 F.3d 479. It reads the affidavit as a critic would, focusing on what is missing as opposed to asking whether what is there is enough to supply some minimal connection between the illegal activity and the place to be searched. *Cf. Allen*, 211 F.3d

at 975 ("The affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."). This approach drives the dissent's two major concerns with the affidavit: its failure to connect White to 196 Turner Lane and its failure to document ongoing drug trafficking inside the residence.

The dissent disagrees that the affidavit establishes that 196 Turner Lane is White's residence. The statement that defendant has dogs "at his residence" is not enough, the dissent says, because the sentence does not specifically say "196 Turner Lane." But this asks for too much. This court has never required affidavits to "use magic words" or spell out "what is obvious in context." *Id.* And context makes perfectly clear that "his residence" in the final sentence is a reference to 196 Turner Lane because the statement was made in reference to the circumstances that officers should expect to confront when searching 196 Turner Lane. Only by reading the operative sentence with a magnifying glass to the exclusion of the rest of the affidavit could the dissent reject our conclusion that a reasonable officer reviewing Williams' affidavit would understand that 196 Turner Lane is White's residence.

The dissent also contends that the search cannot be saved under the good-faith exception because the affidavit failed to recount a drug sale inside the residence. We can agree that Williams never observed White sell drugs from inside the residence without conceding that the totality of the facts in the affidavit are insufficient to establish some minimal connection between White's drug trafficking and his residence. The affidavit states that police had information from a confidential source that "marijuana was being sold" from 196 Turner Lane, a fact that Williams was able to corroborate by executing a controlled buy involving the same narcotic in the driveway of 196 Turner Lane and conducting additional investigative steps that connected White to the residence and prior narcotics crimes. Rather than indulge the inferences reasonably drawn from the totality of these facts—that White is a drug dealer selling marijuana on the premises of his residence, *cf. Berry*, 565 F.3d at 339—the dissent isolates each fact and at every turn insists on more: the affidavit recounts a single drug sale, but not *multiple ones*; it recounts a drug sale on the premises, but not *inside the residence*; it recounts what White had inside his residence, but it wasn't *incriminating*; and so on.

Yes, the affidavit could have said all of the things that the dissent notes are "missing" and, if it did, there would no dispute that the affidavit established probable cause. But the dissent's glass-half-full, divide-and-conquer approach is not how we read affidavits for purposes of the good-faith exception. *See United States v. Thomas*, 605 F.3d 300, 311 (6th Cir. 2010) (noting that the dissenting opinion "improperly divides and attacks the evidence provided in the affidavit instead of viewing the evidence in its totality"). We look not to what the affidavit *could have* said, but rather what it *did* say and ask whether a reasonable officer would have relied on a judicially authorized warrant based on that affidavit. *Allen*, 211 F.3d at 975. And for the reasons discussed above that we need not repeat here, the facts related in Williams' affidavit are sufficient to establish some minimal nexus between White, his drug sales activity, and his home.

The dissent's unforgiving approach to reading the affidavit in turn influences its application of our good-faith precedent. The dissent concludes that *Jones* is distinguishable because it involved *multiple* controlled buys; *Frazier* and *Berry* are not analogous because there was *more* evidence of ongoing drug trafficking; and *Van Shutters* is inapposite because it involved a *longer* investigation. But all of these are differences of degree, not kind. And when the governing legal scheme eschews "rigid rules, bright-line tests, and mechanistic inquiries," *Florida v. Harris*, 568 U.S. 237, 244 (2013), and when there is no controlled-buy, trafficking-activity, or investigative-hours quota that an affiant must meet before we can find good-faith reliance, differences of degree do not necessarily counsel a different result.

More importantly, the differences in the cases that the dissent highlights do not detract from the basic purposes for which we employ them. *Jones* did involve more controlled buys than our case, but none of them occurred *inside* the residence, putting to rest the dissent's contention that the absence of trafficking activity inside the residence renders reliance on this affidavit unreasonable. *See* 159 F.3d at 974–75 ("[T]he fact that the incidents referred to in the affidavits took place on the premises rather than inside the house does not invalidate the search of the house."). *Frazier* and *Berry* may have involved more drug-trafficking activity, but neither case intended to set the minimum requirements for attaining "drug dealer" status, a status that is reasonably inferable in this case based on the information that White was selling drugs from his residence, police saw him sell drugs on the same premises, and he had a history with narcotic

offenses. *Cf. Berry*, 565 F.3d at 339; *Frazier*, 423 F.3d at 533. Finally, the officer in *Van Shutters* may have conducted a lengthier investigation, but nothing in that opinion indicates that good-faith reliance was directly tied to the length of the investigation; rather, we held that it was reasonable to infer that the residence searched was the defendant's based on the type of information contained in the affidavit. *See* 163 F.3d at 337–38. Applying that principle here, it is imminently reasonable to infer that 196 Turner Lane was defendant's residence based on Williams' description of what he kept inside it (i.e., pit bulls).

In contrast to these cases, the case law on which the dissent relies is distinguishable in the most material respects. First, consider *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006). In *McPhearson*, police executed an arrest warrant for the defendant at his home, arresting him on his front porch. *Id.* at 520. In the ensuing pat-down, police recovered drugs on the defendant's person. *Id.* at 520–21. On that basis alone, the officers sought and received a search warrant for his residence, believing it contained evidence of "drug trafficking." *Id.* at 521. The defendant later moved to suppress the evidence gathered from the search, claiming that the warrant lacked probable cause.

This court agreed with the defendant that the affidavit "did no more than state that McPhearson, who resided at [the address of the home to be searched], was arrested for a non-drug offense with a quantity of crack cocaine on his person." *Id.* at 524. These averments were insufficient because "[a] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause." *Id.* (brackets and internal quotation marks omitted). Of particular concern to the court was the absence of any allegation that McPhearson was a known drug dealer: "In the absence of any facts connecting McPhearson to drug trafficking, the affidavit in this case cannot support the inference that evidence of wrongdoing would be found in McPhearson's home because drugs were found on his person." *Id.* at 525.

The court then proceeded to the good-faith analysis. The court concluded that the affidavit did not "establish the minimal nexus that has justified application of the good-faith exception" because "[t]he only connection in the affidavit between [the residence] and drug trafficking was that Jackson police arrested McPhearson at his residence and found crack cocaine

in his pocket in a search incident to the arrest." *Id.* at 526. The court distinguished our cases applying the good-faith exception because those cases "depended on the fact that each of the defendants were known to have participated previously in the type of criminal activity that the police were investigating." *Id.* In contrast, the affidavit in *McPhearson* "did not allege that McPhearson was involved in drug dealing, that hallmarks of drug dealing had been witnessed at his home, . . . or that the investigating officers' experience in narcotics investigation suggested to them that [the amount of seized] cocaine was a quantity for resale." *Id.* at 527.

This case is not *McPhearson*. As this court has previously explained, the "chief concern in *McPhearson* was the 'absence of any facts connecting McPhearson to drug trafficking.'" *United States v. Taylor*, 471 F. App'x 499, 513 (6th Cir. 2012) (quoting *McPhearson*, 469 F.3d at 525); *see also United States v. Feagan*, 472 F. App'x 382, 393 (6th Cir. 2012) ("In *McPhearson,* we drew a sharp distinction between the defendant in that case—who was arrested for assault, and found with only a small amount of drugs on his person—and suspects believed to be ongoing drug traffickers."). *McPhearson* itself acknowledged that our cases apply the good-faith exception when the affidavit indicates that the "defendants were known to have participated previously in the type of criminal activity that the police were investigating." *McPhearson*, 469 F.3d at 526. The affidavit in this case not only indicates that defendant was known to distribute drugs from a particular address, it relates a controlled buy from the defendant on those premises within the last 72 hours. Put differently, the affidavit contains two features that *McPhearson* itself said would have supported a minimal connection had they been included in the affidavit: allegations that the suspect "was involved in drug dealing" and "hallmarks of drug dealing had been witnessed at his home." *Cf. id.* at 527.

The dissent's reliance on *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016) fares no better. In *Brown*, police sought a search warrant for the defendant's home after they recovered drugs from a car that was parked at a codefendant's house but was registered to the defendant's home address. *Id.* at 379–80. The affidavit also stated that the defendant had a criminal history involving drug offenses. *Id.* at 380. This court rejected the claim that these facts were sufficient to establish probable cause to search the defendant's residence. We said, "[T]he search warrant affidavit contained no evidence that Brown distributed narcotics from his home, that he used it to

store narcotics, or that any suspicious activity had taken place there. The affidavit did not suggest that a reliable confidential informant had purchased drugs there, that the police had ever conducted surveillance at Brown's home, or that the recorded telephone conversations linked drug trafficking to Brown's residence." *Id.* at 382–83. In the absence of these facts, Brown's status as a known drug dealer was not enough to establish probable cause. *Id.* at 383. Nor was it sufficient to pass muster under the "less demanding" bare-bones standard. *Id.* at 385–86. "Save for a passing reference to Brown's car registration," the court observed, "the affidavit [was] devoid of facts connecting the residence to the alleged drug dealing activity." *Id.* at 385. Because the affidavit failed to "draw some plausible connection to the residence," the good-faith exception did not save the search. *Id.* at 385–86.

This case is not *Brown*, either. The affidavit in *Brown* was "devoid" of facts connecting drug distribution to the defendant's home, failing to "draw some plausible connection to the residence." *Id.* at 385. It lacked "evidence that Brown distributed narcotics from his home," "that any suspicious activity had taken place there," "that a reliable confidential informant had purchased drugs there," or "that the police had ever conducted surveillance at Brown's home." *Id.* at 382. In contrast, the affidavit in this case states that White sold drugs from the premises of his residence, engaged in peculiar behavior by waiting in his driveway to consummate the deal, and had dogs inside his home. In other words, it contains facts that would have saved the search in *Brown*.

In the final analysis, the disagreement in this case stems from a difference in approaches to reading affidavits. Taking a holistic, common-sense approach, we draw certain factual conclusions, which, in turn, inform our analysis of where this case fits in the spectrum of cases in which this court has applied the good-faith exception. The dissent, unwilling to accept those same factual predicates as a result of a cramped reading of the affidavit, places this case at the opposite end of the spectrum. And this disagreement does have Fourth Amendment consequences, though not in the way the dissent predicts.

Contrary to the dissent's assertion, excluding the evidence in this case will not advance the core purpose of the Fourth Amendment in any appreciable way. As the Supreme Court made clear in *Leon*, when an officer secures a judicial warrant before conducting a search, as Williams

did in this case, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." 468 U.S. at 921. In order to deter unlawful police conduct in these cases, then, it is not enough that we find the warrant lacked probable cause; we must go further and conclude that there were "no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23; *see also Davis v. United States*, 564 U.S. 229, 237–38 (2011) ("[S]ociety must swallow this bitter pill when necessary, but only as a 'last resort,'" and only when "the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights." (citation omitted)). This inquiry is purposefully "less demanding," *Laughton*, 409 F.3d at 748, for there must be a difference between the "bare-bones" and "substantial basis" standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function, *see Leon*, 468 U.S. at 906–07, 913–21; *Carpenter*, 360 F.3d at 595.

D.

To summarize: Williams' affidavit is not "bare bones" or otherwise "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Leon*, 468 U.S. at 923. It contains sufficient factual content that, when read in a holistic, common-sense manner, establishes a "minimally sufficient nexus" between defendant's drug-distribution activity and his residence. *Carpenter*, 360 F.3d at 596. Its averments show that defendant was selling drugs from a residence, that the affiant personally observed defendant sell drugs on those premises, that he knew defendant had prior drug offenses, and that the residence was, in fact, defendant's. That factual content, though maybe not enough to establish probable cause, stands in stark contrast to prototypical bare-bones affidavits from *Nathanson* and *Aguilar*. Indeed, a reasonable officer could draw from Williams' affidavit many of the same inferences that this court has previously indulged in upholding a search warrant under the good-faith exception, *see id.* at 595–96; *Van Shutters*, 163 F.3d at 336–37, a conclusion that is only bolstered by the fact that this court has found probable cause in similar, though not identical, affidavits, *see Jones*, 159 F.3d at 974–75; *Smith*, 783 F.2d 648, 649–51. For these reasons, the

good-faith exception applies, and we affirm the district court's decision denying defendant's motion to suppress.

IV.

Defendant also challenges his sentence in two respects. First, he argues that the district court erred by failing to specify the start date for his term of incarceration. Had the district court done so, he argues, his concurrent sentence would have been calculated from the time he was in "federal custody"—which, according to his reading of the PSIR, was February 25, 2014—making his release date sometime in November 2016. Second, he argues that the district court failed to recognize its authority to adjust his sentence under U.S.S.G. § 5G1.3(b). He acknowledges that we review these unpreserved claims for plain error. *United States v. Mahbub*, 818 F.3d 213, 223 (6th Cir. 2016).

Defendant's first argument is based on the faulty premise that he was in "federal custody" beginning on February 25, 2014. Because he was serving an ongoing state sentence at the time of his initial appearance, defendant came to federal authorities on a writ of habeas corpus *ad prosequendum*, which he acknowledges. When a State sends a prisoner to federal authorities pursuant to such a writ, "the prisoner is merely 'on loan' to the federal authorities," with the State retaining primary jurisdiction over the prisoner. *United States v. Casas*, 425 F.3d 23, 67 (1st Cir. 2005). As a consequence, "[a] federal sentence does not begin to run . . . when a prisoner in state custody is produced for prosecution in federal court pursuant to a federal writ of habeas corpus *ad prosequendum*." *United States v. Evans*, 159 F.3d 908, 912 (4th Cir. 1998). "[F]ederal custody commences only when the state authorities relinquish the prisoner on satisfaction of the state obligation." *Id.* Accordingly, the district court did not plainly err in failing to specify February 25, 2014, as the start date for his federal sentence—indeed, it would have been wrong to do so. Although it is unclear when exactly defendant officially came into federal custody, we need not wander down that rabbit hole in order to resolve defendant's claim. "[A]fter a defendant is sentenced, it falls to BOP, not the district judge, to determine when a sentence is deemed to 'commence,'" *United States v. Wells*, 473 F.3d 640, 645 (6th Cir. 2007) (citation omitted), something the district court itself recognized at sentencing.

Defendant's second argument is also without merit. Relying on U.S.S.G. § 5G1.3(b), defendant contends that the district court erred in failing to adjust his sentence for the time he served on a probation-revocation sentence arising from the same conduct as the instant offense. Section 5G1.3(b) does direct district courts to "adjust the sentence for any period of imprisonment already served on [an] undischarged term of imprisonment" when that prior term of imprisonment "resulted from another offense that is relevant conduct to the instant offense of conviction under [U.S.S.G. § 1B1.3(a)(1)-(3)]." U.S.S.G. § 5G1.3(b). However, the Guidelines Commentary indicates that "[*s*]*ubsection (d)* applies in cases in which the defendant was on . . . state probation . . . at the time of the instant offense and has had such probation . . . revoked." U.S.S.G. § 5G1.3, comment. (n.4(C)) (emphasis added). Subsection (d), in turn, provides that "the sentence for the instant offense may be imposed to run concurrently . . . to the prior undischarged term of imprisonment," U.S.S.G. § 5G1.3(d), which is precisely what the district court did in this case. We therefore cannot conclude that the district court committed plain error in applying § 5G1.3.

V.

For these reasons, we affirm defendant's convictions and sentences.

---

**DISSENT**

---

JANE B. STRANCH, Circuit Judge, dissenting.  A warrant was issued authorizing the search of a residence at 196 Turner Lane on the basis of an affidavit stating that a police officer had observed Albert White sell one baggie of marijuana in the driveway of that residence and then drive away.  The affidavit provided no evidence that drugs were present inside the residence or that drug trafficking had ever occurred there, no direct evidence that White had sold drugs more than once, and no direct evidence connecting White to the residence except his presence in its driveway on one occasion.  The district court concluded that probable cause did not exist for the issuance of the warrant.  Nonetheless, the court denied White's motion to suppress the evidence gathered from that search based on the good-faith exception established in *United States v. Leon*, 468 U.S. 897 (1984).  The majority concludes that this affidavit contained a sufficient nexus between drug trafficking and the inside of the residence to apply the good-faith exception.  I respectfully dissent.

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  To justify the issuance of a warrant to search a particular place, an affidavit must establish a "nexus between the place to be searched and the evidence to be sought."  *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (quoting *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)).  "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

The district court concluded that the affidavit in this case was insufficient to establish probable cause to search the residence because it failed to establish the required nexus between the house and drug trafficking.  Specifically, the district court noted that the affidavit at no point

provides information: that the property is White's residence, that White was ever seen entering or exiting the residence, or that he has any connection or interest in it whatsoever. Without some connection between the observed drug transaction and the residence, besides the fact that it took place in the property's driveway, the search warrant could have authorized the search of an innocent bystander's home where White chose to conduct this single sale of marijuana. I agree that such limited evidence did not establish probable cause to issue this warrant, and the government concedes for purposes of appeal that the affidavit did not establish probable cause. The warrant in this case thus violated the Fourth Amendment.

Generally, evidence obtained in violation of the Fourth Amendment is suppressed under the exclusionary rule. *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The Supreme Court has created a good-faith exception to the exclusionary rule, however, when an officer obtained evidence "in objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. *Leon* provided four examples of when suppression of evidence remains an appropriate remedy because the circumstances demonstrate that the officer did not act in good faith or did not have objectively reasonable grounds for believing that probable cause existed. *Id.* at 923. As relevant here, the good-faith exception is inappropriate "where the affidavit was nothing more than a 'bare bones' affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006). Although the *Leon* good-faith standard is less demanding than the probable cause standard, the affidavit must still contain "a minimally sufficient nexus between the illegal activity and the place to be searched." *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016) (quoting *Carpenter*, 360 F.3d at 596).

This circuit has not applied the good-faith exception when police searched the inside of a residence based only on evidence that the defendant engaged in illegal activity outside it, without some additional evidence from which illegal activity inside the residence could be inferred. *See United States v. Buffer*, 529 F. App'x 486, 487 (6th Cir. 2013) (rejecting the good-faith exception due to the "critical gap between the observation of limited criminal activity *outside* of a dwelling and the *interior* space that the police sought to search"). In *Brown*, we considered an affidavit

that described the defendant's arrest three weeks earlier during an attempted heroin delivery. 828 F.3d at 379. After the arrest, officers found the defendant's car parked outside a heroin dealer's home and performed a canine search during which the dog alerted. *Id.* The affidavit also noted that the defendant had a prior conviction for conspiracy to distribute marijuana. *Id.* at 380. Despite the facts that the defendant had been arrested recently for drug trafficking, had a prior conviction for drug trafficking, and his car was connected to drug trafficking, we concluded that the good-faith exception did not apply to a search of the defendant's residence because the only fact in the affidavit connecting the defendant's residence to his drug dealing activity was the registration of his car to the residence. *Id.* at 385–86. We explained that: "In sum, our cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." *Id.* at 384. We noted that the affidavit contained no evidence that the defendant sold or stored drugs in his home, nor did the affidavit indicate that police had surveilled or investigated the home to determine whether it was linked to the drug conspiracy. *Id.* at 382, 385.

In *United States v. McPhearson*, after police observed the defendant exit his home and arrested him on his front porch for assault, police found crack cocaine in the defendant's pocket. 469 F.3d 518, 520 (6th Cir. 2006). The affidavit, in relevant part, consisted of a single paragraph describing the incident, stating that the defendant was arrested for a non-drug offense with drugs on his person and that he resided at the address to be searched. *Id.* at 521, 524. We concluded that this affidavit was "bare bones" and failed to establish the required minimal nexus between the defendant's home and drug dealing. *Id.* at 526–27. Even though the police had "*indisputable* proof that drugs had recently been inside the defendant's residence," we nonetheless held that it was not established that drugs and related paraphernalia would be in that same residence absent some additional evidence of drug trafficking there. *United States v. Abernathy*, 843 F.3d 243, 254 (6th Cir. 2016) (describing *McPhearson*). We noted in *McPhearson* that the affidavit did not allege that officers or informants had witnessed any of the hallmarks of drug dealing occurring inside the home, such as heavy traffic to and from the residence. 469 F.3d at 527.

Even when an affidavit contains evidence of drug trafficking inside a residence, our precedent rejects the good-faith exception when that evidence consists of only a single drug transaction without any evidence of ongoing drug trafficking. In *Hython*, we recognized that drug sales occur along a "continuum ranging from an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances, to an organized group operating an established and notorious drug den." 443 F.3d at 485. We found that a single controlled buy of crack cocaine from inside a residence might indicate no more than criminal activity on the lower end of that continuum. *Id.* at 486. Although the confidential informant in *Hython* provided information suggesting that the seller had been a source of crack cocaine before, *id.*, we held that this evidence was not enough to demonstrate ongoing drug trafficking that might warrant the good-faith exception, *id.* at 488–89.

Like *Brown* and *McPhearson*, *Hython* noted that the affidavit lacked any indication of further police surveillance, which might have substantiated the evidence gathered from the single controlled buy: "the affidavit includes no observation of deliveries to the address, no monitoring of the frequency or volume of visitors to the house, no second controlled buy, no further surveillance whatsoever." *Id.* at 486; *see also id.* at 488–89 ("Any of these things might serve to establish that the house was the site of an ongoing criminal enterprise . . . . However, without any of these elements, the affidavit is patently insufficient."). Although the analysis in *Hython* arose in the context of staleness, which is not at issue here, the decision shows the limited evidentiary value of a single controlled buy (even from *inside* a residence) and provides clear guidance for the type of police investigation and surveillance that would support the good-faith exception. The majority fails to acknowledge *Hython* even though it is binding precedent and was included in White's arguments on appeal.

The affidavit in this case is similar to those found insufficient for the good-faith exception in *Brown*, *McPhearson*, and *Hython*. First, as in *Brown* and *McPhearson*, the affidavit here contained no evidence indicating the sale or presence of narcotics *inside* the residence to be searched. Like the bare bones affidavit in *McPhearson*, the relevant part of this affidavit contained just one paragraph that largely recited evidence that the defendant engaged in a single drug transaction near but outside the residence to be searched. According to the affidavit, the

officer observed that White was already sitting in a truck in the driveway when the confidential informant pulled in alongside him. The entire transaction took place in the driveway, and then the officer observed White drive away. The affidavit never states that the officer observed White enter or exit the home, and suggests that he did not. The affidavit neither alleged nor provided evidence that the informant had ever been inside the residence, let alone that the informant had observed contraband or illegal activity there.

Besides the description of the one controlled buy, the affidavit provides a vague description of the information the police received beforehand, notes White's criminal history, and states that he is known to have dogs at his residence. None of these statements clearly relate to the inside of this residence, let alone provide any evidence of drugs or criminal activity there. The affidavit states that police "received information that marijuana was being sold from 196 Turner Lane" by White. No further detail is provided regarding the source, recency, or reliability of that information. Even if we infer that the statement referenced the residence's interior, this allegation was bare bones except to the extent it was independently corroborated. *See Brooks*, 594 F.3d at 493 ("[I]n the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration." (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005))). The affidavit contains no information regarding the informant's reliability save the after-the-fact completion of a controlled buy. That transaction, however, occurred in the driveway and does not corroborate ongoing drug activity inside the residence. The affidavit, moreover, fails to show that the police conducted any independent investigation to corroborate drug activity inside the home at 196 Turner Lane.

The majority opinion states five times that the affidavit described "what White kept *inside* the residence." Maj. Op. at 11 (emphasis added); *see also id.* at 8, 9, 14, 18. In fact, the affidavit did not describe anything inside the residence. The affidavit stated that White "is also known to have dogs believed to be pit bulls at his residence." Even if we assume that 196 Turner Lane was White's residence (which we cannot, as will be shown below), the statement that White may have dogs "at" his residence would not indicate that police had any idea what White kept "inside" it. There was simply no evidence of drug trafficking inside the residence, which is the "critical element in a reasonable search." *Zurcher*, 436 U.S. at 556.

The affidavit's second weakness is that, like the affidavits in *Brown*, *McPhearson*, and *Hython*, it lacks evidence of ongoing drug trafficking. The affidavit provides no evidence to corroborate that White ever sold drugs besides the single observed sale, and the investigation described in the affidavit is almost entirely limited to that incident. The affidavit does note that White's criminal history includes "numerous possessions of SCH II and VI." This history, however, is twice removed from evidentiary value: it is both undated and includes only prior possession of drugs, not trafficking. The majority asserts that the affidavit's reference to this criminal history shows that White's conduct was ongoing and the observed sale was not an aberration. Maj. Op. at 7–8. Our binding precedent does not support that conclusion. In *Brown*, we held that the defendant's twelve-year-old conviction for conspiracy to distribute marijuana did not impact our conclusion that the good-faith exception did not apply, because it "hardly proves that Brown was dealing drugs at the time of his arrest." 828 F.3d at 384 n.3; *see also id.* at 385 (old conviction was not "probative of whether Brown was using his current residence for drug trafficking"). Unless we draw an inference from "unasserted but hypothetically possible facts"—which this court called "unacceptable" in *Hython*, 443 F.3d at 489—an undated history of drug possession provides no evidence that White was engaged in ongoing drug trafficking preceding the single controlled buy.

Evidence of a single controlled buy, without more, might indicate no more than "an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances." *Id.* at 485. While the observation of a drug sale here may suffice to search White's car, that single sale in a driveway does not by itself demonstrate the kind of ongoing drug trafficking that we have found to authorize a search of that seller's home. *See Brown*, 828 F.3d at 384 ("[O]ur cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity . . . it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer."). Rather, *Brown*, *McPhearson*, and *Hython* each found that evidence of one drug-related incident was insufficient for the good-faith exception. Further evidence from police surveillance or investigation, such as deliveries, heavy traffic, or additional controlled buys, is necessary to establish the residence's connection to ongoing drug trafficking. *See Brown*, 828 F.3d at 382, 385; *McPhearson*, 469 F.3d at 527; *Hython*, 443 F.3d at 486, 488–89. Here, no

such further surveillance or investigation is apparent from the affidavit or can be inferred from it.**[1]**

The affidavit's third gap is that it does not clearly establish White's connection to 196 Turner Lane. The affidavit never states that the address is White's home and includes no documentary evidence linking White to the address. The only police surveillance described involved White's presence on the publicly accessible portion of the property and does not include observing White enter or exit the residence. By contrast, in *Brown*, the defendant's car, which tested positive for drugs, was registered to his home, and upon arrest he and his driver's license corroborated the address. 828 F.3d at 379, 382. In *McPhearson*, police observed the defendant exiting the home and E-911 records revealed the address to be his residence. 469 F.3d at 521. Given the very limited surveillance and investigation described in this affidavit, it appears that the police failed to establish that 196 Turner Lane was White's residence before executing the search.**[2]**

The majority claims that the affidavit's statement that White is "known to have dogs . . . at his residence" raises a sufficient inference that the residence was White's. Though the affidavit states that White is known to have dogs "at his residence," it does not specify 196 Turner Lane, nor does it aver that those or any dogs were ever seen at 196 Turner Lane. Not only does the "known to have" language suggest that the police heard this information secondhand from some unspecified source, it simply fails to connect the statement to the issue of whether 196 Turner Lane was White's residence. Nor does it provide any support for an

---

**[1]**The majority suggests that the single controlled buy evidences "hallmarks of drug dealing" being "witnessed at his home," distinguishing this case from *McPhearson*, but that makes two mistakes. Maj. Op. at 17 (quoting *McPhearson*, 469 F.3d at 527) *McPhearson* specifically describes the "hallmarks of drug dealing" as "heavy traffic to and from the residence," which was absent here, not a single controlled buy *outside* the residence. 469 F.3d at 527. Plus, as explained in the next paragraph, the affidavit did not provide evidence that the observed drug dealing by White occurred at "his home." *Id.*

**[2]**The majority attempts to distinguish *Brown* by noting that in *Brown* the affidavit lacked evidence connecting the defendant's drug dealing to his home, while here, according to the majority, the affidavit "states that White sold drugs from the premises of *his* residence, engaged in peculiar behavior by waiting in *his* driveway to consummate the deal, and had dogs *inside his* home." Maj. Op. at 18 In fact, the affidavit states none of these things, because it never states or provides any evidence that 196 Turner Lane was White's residence (or that dogs were "inside" it).

inference that the police determined through investigation that 196 Turner Lane was in fact White's residence.

The three weaknesses described above render the inference that drug contraband is likely to be found inside drug traffickers' homes impermissible here.  The affidavit provides insufficient evidence to establish the required nexus between the residence and White's alleged drug trafficking, White's status as an ongoing drug trafficker, or the residence's status as his home.  *See Brown*, 828 F.3d at 383–84 (inference that evidence of drug trafficking would be found at known drug dealer's home is permissible only with some additional evidence connecting the known drug dealer's ongoing criminal activity to the residence).  In *Brown* the defendant was arrested while in a car en route to a heroin delivery, possessed nearly $5,000 in cash when arrested, had a prior conviction for drug distribution, and his car tested positive for narcotics while it was parked at a heroin dealer's house.  We concluded that this evidence was insufficient to establish the defendant's status as a drug dealer sufficiently to permit a search of his residence.  *Id.* at 384–85 & n.3.  The lesser evidence here is similarly insufficient to establish White's status as an ongoing drug dealer.  Furthermore, the district court properly concluded that the inference that drugs will be found in a drug trafficker's home may not be drawn "when the affidavit does not establish that it is in fact *their* home."

As in *Brown* and *McPhearson*, the affidavit here lacks any evidence of drugs or drug activity inside the residence (the place to be searched).  As in *Brown*, *McPhearson*, and *Hython*, the affidavit here lacks any evidence of ongoing drug trafficking beyond a single incident.  And significantly, the affidavit here lacks direct evidence that the residence in fact belonged to White, a failure not apparent in any prior case in which this circuit has applied the good-faith exception.  Cumulatively, these weaknesses render this affidavit so lacking in indicia of probable cause to search the residence that it fails to meet the requirements for the good-faith exception.

The majority references our statement that an affidavit is to be "judged on the adequacy of what it does contain, not on what it lacks."  Maj. Op. at 14 (quoting *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc)).  But this statement was made in reference to the probable cause analysis, not the good-faith exception.  The good-faith analysis is explicitly based on what is lacking, asking whether the affidavit was "so *lacking* in indicia of probable cause as to

render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (emphasis added). I list the key elements this affidavit lacks for two reasons—because our binding precedent has stated that similar affidavits failed to qualify for the good-faith exception because they lacked these elements and to demonstrate the limited nature of what this affidavit contains. To list each of these flaws is not to divide and conquer, *see* Maj. Op. at 15, but to emphasize how, together, they add up to an affidavit that contains insufficient facts.

The affidavit, read in totality and in a common-sense way, states that an officer received information (of uncertain recency or reliability) that White was selling drugs on certain premises, observed a single drug transaction on those premises but outside the residence, learned that White had prior convictions for drug possession, and learned secondhand that White was known to have dogs at his residence. These facts together do not provide an officer with the minimum required under our precedents to believe that drugs are likely to be found *inside* the residence. Assuming that drugs might be found there is not a common-sense inference from the totality of these facts, but an inference from presumed facts that are simply not present in the affidavit. Such "unasserted but hypothetically possible facts" are "unacceptable." *Hython*, 443 F.3d at 489. The totality of limited facts that the affidavit contains do not link the inside of the residence to drug trafficking, precisely because they lack the types of evidence our precedent has stated demonstrates such a link.

This conclusion accords with the core purpose of the Fourth Amendment, which is to protect against unreasonable government intrusion into the home. *Brown*, 828 F.3d at 381 (citing *Payton v. New York*, 445 U.S. 573, 585 (1980) and *Kyllo v. United States*, 533 U.S. 27, 31 (2001)). It also accords with the purpose of the exclusionary rule, which is designed to prevent that and other Fourth Amendment violations by deterring unlawful police conduct. *United States v. Calandra*, 414 U.S. 338, 619–20 (1974). Applying the exclusionary rule here is appropriate to deter police from searching the homes of innocent persons based on drug activity that others may engage in on the publicly accessible portions of their property. *Cf. Abernathy*, 843 F.3d at 254–55 (reasoning that "there is no way of knowing with certainty" whether drugs recovered from a trash pull "came from Defendant's residence at all"). Furthermore, our precedent had provided clear guidance for the type of simple investigatory steps that might have found probable cause

here, such as conducting more than one controlled buy on the premises (or, for even stronger evidence of probable cause, inside the residence), surveilling the property for heavy traffic, observing White enter or exit the residence, or finding basic documentary evidence to establish that the residence belonged to White. *See McPhearson*, 469 F.3d at 527; *Hython*, 443 F.3d at 486, 488–89.

The majority disagrees. It cites two cases that *Leon* used as examples of "bare bones" affidavits, which merely stated the author's beliefs or referenced unsourced and unspecified information without corroboration, then argues that the affidavit here looks nothing like those. *See Nathanson v. United States*, 290 U.S. 41 (1933) and *Aguilar v. Texas*, 378 U.S. 108 (1964) (cited in Maj. Op. at 8–9). Indeed, but the affidavits in *Nathanson* and *Aguilar* do not constitute the spectrum of affidavits that are bare bones. Our precedent does. *McPhearson* held that its affidavit was bare bones and it described information gathered from direct police observation and investigation (and looked quite similar to the affidavit here). *See McPhearson*, 469 F.3d at 521, 526. Regardless, the good-faith exception is inappropriate where an affidavit is bare bones *or* where it is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Hython*, 443 F.3d at 484; *Leon*, 468 U.S. at 923. Asserting that the affidavit here contains more evidence than those in *Nathanson* and *Aguilar* tells us little about whether the good-faith exception is appropriate.

The majority also cites a number of cases in which we applied the good-faith exception, but each is distinguishable from the instant case. The majority does not and cannot cite any of our cases in which a single observation of transient drug activity outside of a residence was sufficient to apply the good-faith exception to a search of the inside of that residence.

The majority asserts that the facts here are "substantially identical" to those in *United States v. Jones*, in which a confidential informant made *at least six* controlled buys from the defendant, two of which occurred in the driveway of the defendant's home. 159 F.3d 969, 974 (6th Cir. 1998) (cited in Maj. Op. at 11–12). Here, the confidential informant made only one purchase from White; the affidavit contains no evidence to corroborate that White sold drugs more than that one time or that White was even on those premises more than once. The six controlled buys in *Jones*, two on the premises to be searched, demonstrated that the defendant

there was engaged in ongoing drug trafficking, including on those premises. The fact that the residence was the defendant's home, moreover, was not in question in *Jones*. In other words, an inference that evidence of drug trafficking would be found in the defendant's home was permissible from the affidavit in *Jones* because it had the exact types of evidence that the affidavit here lacks.

The majority cites another set of cases to show that drug trafficking outside a dealer's home can support an inference that permits a search of the interior of the dealer's home. Those cases are not analogous to this case for one of the same reasons as *Jones*: none of those cases contained the issue of whether the residence to be searched was in fact the defendant's home. *See Frazier*, 423 F.3d at 532–33 (citing a series of cases holding that "an informant's observation of drug trafficking outside of *the dealer's home* can provide probable cause to search *the dealer's house*" (emphasis added)); *United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009) ("observation of drug activity near *defendant's home*" (emphasis added)); *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) ("*his* residence" (emphasis added)). Each of those cases also involved significantly more evidence suggesting the defendant's ongoing drug dealing than here. *See Berry*, 565 F.3d at 339 (defendant had prior conviction for drug trafficking, was arrested for violating probation with crack cocaine in his car, and was renting his apartment in violation of his probation under an alias and paying rent in cash); *United States v. Miggins*, 302 F.3d 384, 388, 393 (6th Cir. 2002) (cited in *Frazier*, 423 F.3d at 533) (defendant was arrested after signing for a FedEx package containing over one kilogram of cocaine under a false name, admitted to being a gang member, had at least one prior cocaine conviction, and lived with another defendant involved in drug trafficking); *United States v. Blair*, 214 F.3d 690, 696 (6th Cir. 2000) (cited in *Frazier*, 423 F.3d at 533) (eleven-page affidavit contained information about the defendants from several reliable witnesses who had worked as prostitutes for the defendants and bought drugs from them, and the defendants owned significant assets despite not filing income returns for years); *Davidson*, 936 F.2d at 857–58 (defendant was previously convicted of drug trafficking, was a known member of a large drug distribution organization, and was repeatedly observed meeting with other members inside his residence over several months).

The other cases cited by the majority are also distinguishable. In *United States v. Carpenter*, police discovered marijuana fields growing near a residence through helicopter surveillance. 360 F.3d at 593. Police observed two men walking along a beaten path from the fields to the back door of the residence. *Id.* That kind of permanent connection between the location of the drugs and the residence in *Carpenter* is hardly analogous to this case, where the drugs were transferred in a driveway between two cars, both of which then drove away. *United States v. Smith* similarly involved evidence of a marijuana plant growing beside the defendant's (uncontested) residence, showing a static, ongoing nexus to the place to be searched that is absent in the transient transaction in this case. 783 F.2d 648, 649 (6th Cir. 1986). Put another way, evidence of drug production is not analogous to evidence of a drug sale for purposes of searching a residence.

In *United States v. Van Shutters*, the police had conducted an active, year-long investigation into a series of car thefts and had already arrested the defendant before obtaining the warrant to search the residence in question. 163 F.3d 331, 334 (6th Cir. 1998). Although the affidavit failed to explain why the affiant believed the property was linked to the defendant, the court found that the affidavit described the residence "with such particularity that a common sense inference is that the affiant visited the premises himself and presumably either observed [the defendant] in the residence, or determined through investigation that [the defendant] frequented the premises." *Id.* at 337. That inference may have been possible there given the length of the investigation and the significantly greater evidence the police had already gathered about that defendant and his crimes. Such an inference is not possible from the affidavit here, which reveals minimal investigation and provides no suggestion that the affiant observed White *in* the residence or determined that he frequented the premises.

The differences between the cases cited by the majority and this case are differences in kind, not just degree. Maj. Op. at 15. Most of the cases above involve no question that the residence searched was in fact the defendant's residence; here there is not just *less* evidence that 196 Turner Lane was White's residence, but *none*. Cases with multiple controlled buys show evidence of ongoing drug trafficking; here, there is not just *less* evidence of ongoing drug

trafficking, there is *none*. As stated above and emphasized in multiple binding precedents, a single controlled buy does not show ongoing drug trafficking.

In sum, because the affidavit did not link drug trafficking to the inside of the residence at 196 Turner Lane, did not establish ongoing drug trafficking beyond the single sale, and did not appropriately link White himself to the residence, the affidavit lacked indicia of probable cause and rendered official belief in such probable cause unreasonable. The good-faith exception to the exclusionary rule does not apply and White's motion to suppress should have been granted.

For these reasons, I respectfully dissent.